**STATE ex rel. Michael Anthony TAYLOR, Petitioner,**

v.

**Troy STEELE, Warden, Respondent.**

**No. SC 90925.**

Supreme Court of Missouri, En Banc.

May 31, 2011.

Rehearing Denied July 19, 2011.

Robert W. Lundt, Public Defender's Office, St. Louis, Matthew B. Larsen, Federal Public Defender's Office, Los Angeles, Robert P. LoBue, Adam Blumenkrantz and Muhammad Faridi, Patterson, Belknap, Webb & Tyler LLP, New York, for Taylor.

Stephen D. Hawke, Attorney General's Office, Jefferson City, for the State.

Mark G. Arnold, Husch Blackwell LLP, St. Louis, for Group of Retired Judges and Prosecutors, who filed a brief as a friend of the Court.

MARY R. RUSSELL, Judge.

Michael Anthony Taylor pleaded guilty to the 1989 kidnapping, rape, and murder of a young girl. He twice was sentenced to death for the murder.[1] After multiple unsuccessful attempts to have his sentence overturned, he now seeks a writ of habeas corpus, arguing that his death sentence should be vacated. He contends that his death sentence was imposed unlawfully by a judge, rather than by a jury, and he asserts that his sentence violates his constitutional rights.

This Court finds that habeas relief is not warranted and refuses to vacate Taylor's death sentence.[2]

## I. Background

Ann Harrison was 15 years old when she died of stab wounds in the trunk of a car in 1989. In 1991, Taylor admitted under oath to kidnapping Ann from her bus stop, raping her, and stabbing her repeatedly with a kitchen knife.[3] He pleaded guilty to

---

1. In addition to the tortuous procedural history of this case detailed in this opinion, further details of Taylor's involvement in the gruesome killing can be found in this Court's previous opinion in Taylor's direct appeal and Rule 24.035 post-conviction appeal, *State v. Taylor*, 929 S.W.2d 209 (Mo. banc 1996).

2. Habeas corpus is an original remedial writ, and this Court has jurisdiction pursuant to Mo. Const. art. V, sec. 4.

3. Taylor's accomplice in Ann's death is the subject of the opinion released concurrent to this opinion, *State v. Nunley*, 341 S.W.3d 611 (Mo. banc 2011).

first-degree murder, armed criminal action, kidnapping, and forcible rape. During plea proceedings, he testified that he did not receive or expect a plea bargain and understood that the State would seek the death penalty against him for Ann's murder.

Taylor sought to be sentenced by the trial judge, rather than by a jury, because he believed that the trial judge was less likely to sentence him to death. But the judge, Judge Randall, sentenced Taylor to death after finding that the statutory factors necessary for that sentence had been established.

Taylor challenged his sentence in a Rule 24.035 post-conviction motion alleging that the judge was under the influence of alcohol during the sentencing proceedings. A special judge, Judge Dierker, was assigned to decide Taylor's post-conviction motion. Judge Dierker denied Taylor post-conviction relief after a hearing, issuing lengthy findings in 1992 that discussed the propriety of Taylor's plea and sentences.

Taylor appealed to this Court. In a summary order in 1993, this Court vacated his sentences and remanded his case for a "new penalty hearing, imposition of sentence, and entry of judgment." *State v. Taylor*, SC74220, Order (June 29, 1993); *see also State v. Taylor*, 929 S.W.2d 209, 215 (Mo. banc 1996) (*Taylor I* ) (explaining the procedural history of Taylor's case).

On remand, Taylor's case was assigned to a new judge, Judge Coburn. Taylor filed a Rule 29.07(d) motion to withdraw his guilty plea. *Taylor I*, 929 S.W.2d at 215. Included in his arguments was that he had consented only to be sentenced by Judge Randall, not the new judge. *Id.* at 215–16. He was not permitted to withdraw his guilty plea, nor was he given

permission to be sentenced by a jury rather than the new judge. *Id.* at 215. His 1991 plea and jury waiver remained in full force on remand. *See id.* at 215–16 ("Although it is preferable if the judge to whom a plea is made sentences the defendant, sentencing by a different judge if the original judge proves unavailable for sentencing does not create manifest injustice ... [where] the sentencing judge has the familiarity with the prior proceedings to make an informed ruling on sentencing.").

Five days of sentencing hearings were held in 1994. *Id.* at 215. The state presented evidence of Ann's kidnapping, rape, and murder as well as evidence showing an escape by Taylor. Taylor presented mitigation evidence through 13 witnesses. *See id.* at 224. Ultimately, Judge Coburn found beyond a reasonable doubt six statutory aggravating circumstances and three non-statutory aggravating circumstances in support of the death penalty, and he found only one mitigating circumstance. *Id.* at 215, 222. Judge Coburn imposed the death sentence after concluding that the mitigating circumstance did not outweigh the aggravating circumstances.[4] *Id.* at 215.

Taylor sought Rule 24.035 post-conviction relief from the judgment entered after remand. A two-day hearing was held on this motion in front of Judge Messina. The scope of this Rule 24.035 hearing related "not [to Taylor's] previous plea, but rather the second sentencing procedure." Judge Messina overruled Taylor's post-conviction motion.

Taylor again appealed to this Court. His appeal sought mandatory proportionality review under section 565.035.5, RSMo 1994, and review of the decisions overruling his motion to withdraw his plea and his

---

4. Taylor's 1994 sentences included death for Ann's murder and consecutive terms of 50 years for armed criminal action, 15 years for kidnapping, and life for rape.

post-conviction motion. *Taylor I* addressed collectively the propriety of Taylor's death sentence imposed on remand and the denial of his subsequent post-conviction motion.

*Taylor I* established that Taylor was sufficiently "informed of the consequences of his plea" in 1991 and that he "understood the consequences and voluntarily entered [his] plea." *Id.* at 216. *Taylor I* also established that there was no error in the refusal to allow him to later withdraw his plea after his case was remanded.[5] *Id.* at 215–18. *Taylor I* concluded that there were no reversible errors in his case and affirmed his death sentence. *Taylor I* became final when the mandate in the case issued on September 17, 1996. At that time, Taylor's execution was set for January 3, 1997, but that execution date was stayed when he sought relief in the federal courts. A later execution date scheduled for February 2006 also was halted by ongoing litigation.

Taylor has filed numerous unsuccessful requests for relief in his case. A request for habeas corpus relief from the federal courts was denied in *Taylor v. Bowersox,* 329 F.3d 963, 968–69 (8th Cir.2003) (finding that Taylor's guilty plea remained valid after this Court's remand in *Taylor I* because he had no substantial and legitimate expectation of being sentenced by the judge who received his plea in 1991, nor did he have a right to be sentenced by the same judge after remand). Taylor also unsuccessfully twice moved this Court to withdraw the mandate in his case, and he has failed to gain relief in other post-

conviction and habeas corpus proceedings. *See Taylor v. State,* 254 S.W.3d 856 (Mo. banc 2008).

Now, 20 years after Taylor admitted to kidnapping, raping, and murdering Ann, he is again before this Court seeking relief from his death sentence.

## II. Taylor's Arguments for Habeas Relief

Taylor claims that he is entitled to habeas relief reducing his death sentence to life imprisonment for two reasons.

First, he maintains that habeas relief should issue because, after this Court affirmed his death sentence in *Taylor I,* subsequent case law indicated that a death sentence could not be imposed by a judge, rather than by a jury. He highlights that the United States Supreme Court in *Ring v. Arizona,* 536 U.S. 584, 589, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), provided that the jury must find any facts that are not admitted by a defendant and that are necessary for imposition of the death penalty.[6] He also notes that *State v. Whitfield,* 107 S.W.3d 253, 256 (Mo. banc 2003), applied *Ring* to vacate a judge-imposed death sentence that had been affirmed before *Ring.*

Taylor argues that the holdings in *Ring, Whitfield,* and their progeny apply retroactively to his case and demonstrate that he is entitled to Sixth Amendment jury sentencing. He contends that he never waived his Sixth Amendment right to jury sentencing when he pleaded guilty and waived jury sentencing in 1991.

---

5. *Cf. Taylor v. Bowersox,* 329 F.3d 963, 968–69 (8th Cir.2003).

6. Taylor notes that a jury never has found the necessary factual findings for imposing his death sentence, which included: (1) at least one statutory aggravating factor was present in the case; (2) the aggravating evidence war-

ranted imposition of the death penalty; and (3) any mitigating evidence was not "sufficient to outweigh the evidence in aggravation." *See* sec. 565.030.4, RSMo 1994 (the statute applicable when Taylor's death sentence was imposed after remand).

Second, he argues that he is entitled to habeas relief because his death sentence violates equal protection and due process because similarly situated defendants have been sentenced to life imprisonment rather than sentenced to death.

## III. Standards for Review

■ "Habeas corpus is the last judicial inquiry into the validity of a criminal conviction and serves as 'a bulwark against convictions that violate fundamental fairness.'" *Amrine v. Roper*, 102 S.W.3d 541, 545 (Mo. banc 2003) (quoting *Engle v. Isaac*, 456 U.S. 107, 126, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)). Habeas proceedings, authorized under Rule 91, are limited to determining the facial validity of a petitioner's confinement. *State ex rel. Simmons v. White*, 866 S.W.2d 443, 445 (Mo. banc 1993). "[A] writ of habeas corpus may be issued when a person is restrained of his or her liberty in violation of the constitution or laws of the state or federal government." *Amrine*, 102 S.W.3d at 545.

■ Because habeas review guards against unauthorized sentences, this Court considers Taylor's habeas claims asserting that his death sentence exceeds the sentence that is legally authorized. *See State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 516–17 (Mo. banc 2010) (providing that a claim that the sentence exceeded what was permitted by law is a claim cognizable in a habeas proceedings even if the argument was raised, or should have been raised, in an earlier proceeding). But Taylor, as the habeas corpus petitioner, has the burden of proof to show that he is entitled to relief. *State ex rel. Nixon v. Jaynes*, 73 S.W.3d 623, 624 (Mo. banc 2002).

## IV. Case Law Subsequent To *Taylor I*

### A. *Apprendi & Ring*

■ In *Apprendi v. New Jersey*, the United States Supreme Court held that the Sixth Amendment does not permit a defendant to be "expose[d] ... to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." 530 U.S. 466, 483, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Under *Apprendi*, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348.

In *Ring*, the court extended its holding in *Apprendi* to provide that the Sixth Amendment affords a capital murder defendant the right to have a jury find the aggravating factors relevant to the imposition of the death penalty. *Ring*, 536 U.S. at 609, 122 S.Ct. 2428. *Ring* stated: "Capital defendants, no less than noncapital defendants, ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589, 122 S.Ct. 2428.

### B. *Whitfield*

In 2003, in *Whitfield*, this Court applied *Ring* retroactively [7] and set aside a defendant's death sentence that had been previously affirmed on appeal before *Ring* was decided. *Whitfield* held that, under *Ring*, the defendant was entitled to have a jury make the "factual determinations on which his eligibility for the death sentence was predicated." *Whitfield*, 107 S.W.3d at 256.

---

**7.** As discussed further below, *Whitfield* applied Missouri's traditional retroactivity analysis in finding that *Ring* applied retroactively in that case and in cases with similarly situated defendants, but *Whitfield*'s retroactivity holding was expressly limited. *See* 107 S.W.3d at 268–69.

In *Whitfield,* the judge had determined the factual issues necessary for imposition of the death penalty after the jury had found the defendant guilty of first-degree murder but then was unable to reach a verdict in the punishment phase of his trial. *Id.* at 261. *Whitfield* found that the defendant's Sixth Amendment rights to jury sentencing as outlined in *Ring* were violated when, after the jury deadlocked, the judge found the essential facts under section 565.030.4, RSMo 1994, that were necessary to impose the death sentence. *Id.* at 261–62.

*Whitfield* observed that the burden was on the State to show that the *Ring* error was harmless, and it concluded that the State could not show the error was harmless because it was unknown, based on the jury deadlock, at what phase the jury reached an impasse when making the required statutory determinations for imposing a death sentence. *Id.* at 262–64.[8] Accordingly, the defendant in *Whitfield* had his death sentence reduced to a sentence of life imprisonment because his death sentence had been unconstitutionally imposed when it was based on determinations not made by a jury. *Id.* at 271–72.

## C. *Blakely*

Subsequent to this Court's holding in *Whitfield,* the United States Supreme Court extended the reach of *Ring* by declaring in *Blakely v. Washington,* 542 U.S. 296, 305–06, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), that the Sixth Amendment right to jury sentencing applies even where a defendant pleads guilty.

In *Blakely,* the defendant pleaded guilty to kidnapping, and "[t]he facts admitted in his plea, standing alone, supported a maximum sentence of 53 months" under Washington state law. 542 U.S. at 298, 124 S.Ct. 2531. The state recommended a sentence within the standard range of 49 to 53 months. *Id.* at 300, 124 S.Ct. 2531. But the defendant was surprised when the judge enhanced his sentence beyond the state's recommendation based on the judge's determinations that the defendant had acted with "deliberate cruelty" toward the victim.[9] *See id.* at 300, 124 S.Ct. 2531. The judge "imposed [on the defendant] an 'exceptional' sentence of 90 months." *Id.* at 298, 124 S.Ct. 2531. The defendant appealed, contending that "the sentencing procedure deprived him of his federal constitutional right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence." *Id.* at 301, 124 S.Ct. 2531.

*Blakely* concluded that the judge's imposition of the exceptional sentence based on his finding of "deliberate cruelty" violated the defendant's Sixth Amendment rights. *Id.* at 303–06, 124 S.Ct. 2531. *Blakely* noted that "[t]he facts supporting [the court's finding of deliberate cruelty] were neither admitted by [the defendant] nor found by a jury." *Id.* at 303. *Blakely* made clear that "every defendant has the *right* to insist that the prosecutor prove to a jury all facts legally essential to the punishment." *Id.* at 313, 124 S.Ct. 2531.

---

**8.** *Whitfield* opined:

[B]ecause the judgment was entered based on the judge's findings of fact rather than that of the jury, *Ring* was violated, *and the burden shifted to the State to show the Ring error was* **harmless** *beyond a reasonable doubt.* A presumption is simply inadequate to meet this high standard, and no affirmative proof sufficient to meet this standard has been offered by the State, as the record is silent in regard to the jury's findings. 107 S.W.3d at 263.

**9.** Under Washington law, "deliberate cruelty" was a statutorily enumerated ground for enhancing the defendant's sentence because it was a domestic violence case. *See Blakely,* 542 U.S. at 300, 124 S.Ct. 2531.

*Blakely* also outlined, however, that "nothing prevents a defendant from waiving his *Apprendi* rights." 542 U.S. at 310, 124 S.Ct. 2531. According to *Blakely,* "[w]hen a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding." *Id.* *Blakely* states:

> If appropriate waivers are procured, States may continue to offer judicial factfinding as a matter of course to all defendants who plead guilty. Even a defendant who stands trial may consent to judicial factfinding as to sentence enhancements, which may well be in his interest if relevant evidence would prejudice him at trial. We do not understand how *Apprendi* can possibly work to the detriment of those who are free, if they think its costs outweigh its benefits, to render it inapplicable.

*Id.*

## V. Taylor Is Not Entitled To Sixth Amendment Jury Sentencing

### A. Taylor Waived Jury Sentencing

■ Pursuant to *Blakely,* whether Taylor waived his rights to Sixth Amendment jury sentencing is an important consideration in determining if his judge-imposed death sentence is authorized. Considering the facts of Taylor's case, his 1991 decision to plead guilty and be sentenced by a judge, rather than by a jury, precludes his ability now to claim the Sixth Amendment entitles him to jury sentencing.

*Taylor I* established that Taylor's 1991 guilty plea and jury waiver was not invalidated after this Court remanded his case for a new sentencing hearing. *See* 929

S.W.2d at 215–18 (approving of the refusal to allow Taylor to withdraw his plea and undergo jury sentencing after his case was remanded). Accordingly, what Taylor knew, intended, and understood in 1991 when he entered his guilty plea is paramount to determining whether he waived his rights to jury sentencing.

The record in Taylor's case shows that, when Taylor entered his plea in 1991, he understood that a consequence of his plea was that he would not have his guilt or sentence determined by a jury.[10] The record demonstrates his understanding that his guilty plea would lead to him being sentenced by a judge, whereas a not-guilty plea would lead to him being sentenced by a jury. Moreover, the record makes clear that he knew that the judge would be considering the State's recommendation of the death penalty. The following testimony illuminates that Taylor willingly declined a jury's involvement in his sentencing:

*From the plea hearing transcript at pages 8–9 (emphasis added):*

*Q. Do you also understand that if you plead guilty it will be up to the judge to decide the sentence on all charges?*

A. Yes.

Q. And as the maximum that you can get on all of these charges, do you understand that *the Judge can give you the death sentence* ?

A. Yes.

*From the plea hearing transcript at pages 9–10:*

Q. If you plead not guilty, do you understand that you have a right to go to trial?

A. Yes.

---

**10.** When Taylor pleaded guilty, the then-applicable statutory scheme intertwined having a jury for the guilt and punishment phases of the trial. As such, his guilty plea foreclosed him from having a jury determine his sentence.

Q. And if you plead not guilty, there would be a trial.

A. Yes.

Q. Do you understand that the trial would be in front of a jury of twelve people?

A. Yes, I do.

Q. And the twelve people would have to be unanimous in their verdict?

A. Yes.

Q. In other words, all twelve would have to agree.

A. Yes.

Q. The twelve people would have to be convinced beyond a reasonable doubt by the state that you're guilty.

A. Yes.

Q. And that would be on each charge, all four counts; do you understand that?

A. Yes. I do.

*From the plea hearing transcript at page 13 (emphasis added):*

Q. Michael, do you understand that if you plead guilty there won't be a trial?

A. Yes, I do.

Q. And you, in essence, would be giving up those rights. Do you understand that?

A. Yes, I do.

Q. *Sometimes we use the word waive. If you plead guilty, you are waiving the right to a trial by a jury.*

A. Yes, I understand.

Q. The right to a trial.

A. Yes, I understand.

*From the plea hearing transcript at pages 19–21 (emphasis added):*

Q. Has anyone made any promises to you about how this is going to turn out if you plead guilty?

A. No, they haven't.

Q. *You know that if you plead guilty the state is going to ask for a death sentence and the Judge could impose death.*

A. Yes, I do.

Q. *Now, if you plead guilty, do you understand that all that would be left for the Court to do would be to sentence you?*

A. Yes.

. . . .

Q. ... [D]o you understand, Michael, that there would still be a sentencing hearing where the state will be presenting evidence, and we, on your behalf[,] *will be presenting evidence to the Judge as to what sentence to propose on the murder charge* ?

A. Yes.

Q. And actually *the Judge can entertain evidence on all of the charges.*

A. I understand.

*From the plea hearing transcript at page 28 (emphasis added):*

Q. *And do you understand that there will be a sentencing proceeding yet to occur in front of the Judge?*

A. Yes, I do.

*From the plea hearing transcript at pages 34–36 (emphasis added):*

Q. Do you understand that ... *you might be entitled to* two trials, that is, one trial *where the jury would decide murder in the first degree and then punishment* if they found you guilty of murder in the first degree.... Do you understand that?

A. Yes.

. . . .

Q. No one has guaranteed you what sentence you're going to receive?

A. No.

Q. No promises have been made to you as to what sentence you're going to receive.

A. No, they haven't.

Q. Has anyone told you what sentence you're likely to receive?

A. No, they haven't.

Q. What sentence do you think you're going to receive as to Count I, murder in the first degree?

A. What sentence do I think?

Q. Yes.

A. I don't know.

Q. Do you understand that *the Judge might very well sentence you to the death penalty in this case* ?

A. Yes, I do.

*Q. Do you know that by pleading guilty here today that instead of twelve people deciding, there will only be one person deciding, this Judge; do you understand that?*

A. Yes, I do.

Q. As to the other counts, *the Judge could sentence you* to the minimum, or he may very well sentence you to the maximum on each of the other counts charged; do you understand that?

A. Yes.

*From the plea hearing transcript at pages 38–42 (emphasis added):*

Q. Have your attorneys gone over with you the different stages that occur at a murder in the first degree trial?

A. Yes.

. . . .

Q. Now, *the second phase would be a separate trial in front of the same jury,* if they do find you guilty of murder in the first degree. Do you understand that?

A. Yes, I do.

Q. It would be like a trial. There would be opening statements. The state would present evidence, and you could present evidence. Do you understand that?

A. Yes, I do.

Q. You would have a right to confront the witnesses, to subpoena witnesses, to subpoena witnesses in. Do you understand that?

A. Yes.

Q. The court would then instruct the jury, the attorneys would argue, and then they would deliberate, the jury would deliberate. Do you understand that?

A. Yes.

Q. During their deliberations, all twelve jurors must find, beyond a reasonable doubt, at least one aggravating circumstance. Do you understand that?

A. Yes.

Q. And if they don't find at least one aggravating circumstance, then they must sentence you to life without parole. Do you understand that?

A. Yes.

Q. Now, the state has filed notice of nine aggravating circumstances, statutory aggravating circumstances. Do you understand that?

A. Yes.

Q. Have you talked about those with your attorney; have you seen those?

A. I'm not real familiar with seeing them, but I have talked with them about them.

Q. When I say that the jury must find at least one, they must find at least one statutory aggravating circumstance. If they don't, it's life without parole. Do you understand that?

A. Yes.

Q. If they do find at least one statutory aggravating circumstance, then they can determine if there are any non-statutory aggravating circumstances. Do you understand that?

A. Yes.

Q. And the state has filed notice, I believe, of [25] or [26] non-statutory ag-

gravating circumstances. Are you aware of that?

A. Yes.

Q. *And the jury would determine if the statutory aggravating circumstances nonstatutory aggravating circumstances and the evidence in the case, whether they warrant the death penalty. Do you understand that*?

A. Yes.

Q. And they must unanimously find that they do warrant the death penalty. Do you understand that?

A. Yes.

Q. And if they don't, then it's life without parole. Do you understand that?

A. Yes, I do.

Q. And then if they find that there are sufficient aggravating circumstances to warrant death, then they must consider whether there are mitigating circumstances. Do you understand that?

A. Yes, I do.

Q. And your attorney has supplied me with notice of five statutory mitigating *circumstances that would be presented to the jury;* do you understand that?

A. Yes.

Q. *And the jury would then consider whether those mitigating circumstances,* or the evidence in the case, whether it outweighs the aggravating circumstances. And if they found that the mitigating circumstances outweigh the aggravating circumstances, then they must sentence you to life without parole. Do you understand that?

A. Yes.

Q. And do you understand that when they consider the mitigating circumstances that they don't have to all unanimously find the same mitigating circumstances; do you understand that?

A. Yes.

Q. And do you understand that even if they find that the mitigating circum-

stances do not outweigh the aggravating circumstances that they still are not obliged to sentence you to death; do you understand that?

A. Yes.

Q. The final decision would rest with the jury. Do you understand that?

A. Yes.

Q. But again in this case it will all be up to one man. Do you understand that?

A. Yes.

Q. Is that what you want?

A. Yes, it is.

## B. Taylor's Jury Waiver Was Purposeful, Not Collateral To His Guilty Plea

Taylor's statements at his initial post-conviction hearing before Judge Dierker in 1992 illuminate what Taylor understood and intended when he pleaded guilty in 1991. At that hearing, Taylor's defense counsel testified that the State's case against Taylor was "one of the strongest cases [that he] had ever encountered" and led to a decision to "concentrate on possible penalty phase evidence" after Taylor pleaded guilty. The record reflects that Taylor's discussions with his attorneys about the prospects of having his case heard by a judge versus a jury led to a purposeful defense strategy of seeking a judge-imposed sentence. He and his counsel thought that his best hope to avoid the death penalty was to have Judge Randall sentence him.

Taylor's testimony on cross-examination at the post-conviction hearing included:

Q. Well, did you think that your chances of not getting death were real good in front of a jury?

A. I knew that I didn't want to go in front of a jury.

Q. And why was that, Mr. Taylor?

A. Because I was admitting my guilt.

Q. I'm not talking about the issue of guilt. I'm talking about the issue of punishment. Did you want to go in front of a jury for them to decide whether you would live or die?

A. Not then but now I do.

PCR Tr. 622–23.

Taylor's own testimony, together with other evidence adduced during the post-conviction hearing, convinces this Court that Taylor intended to plead guilty at all times during the underlying case and had no desire whatsoever to go to trial on any issue before the jury. Taylor understood and agreed that the facts of his case compelled adoption of the strategy of pleading guilty, with sentencing by a judge rather than trial by jury.

Although section 565.006.2, RSMo 1986,[11] was not discussed with Taylor, counsel concentrated on the best strategy to avoid a death sentence. A jury was viewed as almost certain to recommend death in light of all the facts of the case. Taylor was aware of and understood counsel's thinking and agreed that a jury trial should be avoided at all costs—his hope lay with a plea to a trial judge who might be inclined to mercy.

The record shows with unmistakable clarity that Taylor purposefully and strategically sought to avoid jury sentencing because he did not want either the guilt or the sentencing portions of his case to be presented to a jury.

---

**11.** All statutory references are to RSMo 1986, unless otherwise indicated.

**12.** Section 565.006.2 provided: "No defendant who pleads guilty to a homicide offense or who is found guilty of a homicide offense after trial to the court without a jury shall be permitted a trial by jury on the issue of the punishment to be imposed, except by agreement of the state."

**13.** Taylor's rejected claims in *Taylor I* included that he should have been permitted to

**C. Taylor's Waiver Of Jury Sentencing Remains Valid**

**1. *Taylor I* Did Not Invalidate Taylor's Waiver Of Jury Sentencing**

■ Taylor unpersuasively argues that *Taylor I* declared that his 1991 guilty plea did not include a waiver of jury sentencing because section 565.006.2 prevented him from having a jury trial on punishment after he pleaded guilty.[12] Contrary to the assertions of the dissent, however, nothing in *Taylor I* or any other case has invalidated Taylor's purposeful, strategic choice in 1991 to have his sentence imposed by a judge, not by a jury.

*Taylor I* rejected Taylor's assertions that he should have been allowed to withdraw his plea.[13] It specifically rejected his arguments that he was insufficiently informed when he pleaded guilty because his counsel had failed to inform him about the possibility of jury sentencing pursuant to section 565.006.2. 929 S.W.2d at 217. To this end, *Taylor I* held:

> Taylor also argues the plea was not knowingly made because he was not informed a jury could sentence him.... [Under section 565.006.2,] jury sentencing after a guilty plea [was] not a right for the defendant to waive, rather a privilege for the State to grant. Taylor did not waive sentencing by a jury because he could only obtain jury sentencing if the State agreed to it. The State

withdraw his guilty plea for the following reasons: "he did not receive the benefit of his plea bargain, the court failed to personally admonish him as required by Rule 24.02, the plea was not knowingly and voluntarily made because Taylor was not informed of the elements of first-degree murder and the possibility of jury sentencing, there was insufficient factual basis to support the plea, and the plea was offered to a defective information." 929 S.W.2d at 215.

did not agree; therefore, there was nothing of which to inform him. A knowing and voluntary plea does not require defendant be told details irrelevant to the decision at hand. . . . Failure to inform Taylor of the possibility of sentencing by a jury did not render his guilty plea unknowing or involuntary.

*Id.*

This discussion in *Taylor I* was confined to addressing Taylor's challenge that his plea was involuntary because he was not fully informed about the provisions of section 565.006.2 that would have allowed the State to agree to provide him jury sentencing.[14] *Taylor I* did not negate the numerous underlying facts showing that Taylor

had no wish to be sentenced by a jury and that he understood that his guilty plea represented a strategic acquiescence to be sentenced by a judge rather than by a jury. The record leaves no doubt that Taylor's knowledge of section 565.006.2 had no impact on his plea, as his aim was to avoid jury sentencing.[15]

### 2. Subsequent Case Law Did Not Invalidate Taylor's Jury Waiver

### a. Taylor's Jury Waiver Remains Valid Even Though It Preceded The Sixth Amendment Jury Sentencing Cases

 Contrary to Taylor's assertions, his 1991 waiver of jury sentencing is not

---

14. Taylor's co-defendant, Nunley, has challenged the constitutional validity of section 565.006.2. In *Nunley*, this Court concludes that section 565.006.2 is constitutional post-*Ring*. This Court notes that other courts have held that guilty pleas and waivers remain valid even if the underlying sentencing scheme on which they are based "explicitly and unequivocally precludes the defendant from receiving a jury sentence." *Nunley*, 341 S.W.3d 611, 622 (quoting *State v. Piper*, 709 N.W.2d 783, 807 (S.D.2006)); also citing *Colwell v. State*, 118 Nev. 807, 59 P.3d 463, 473 (2003) (upholding the Nevada statutory scheme that unequivocally eliminated the right to a jury at sentencing because the defendant pleaded guilty and validly waived his right to a jury trial); *Moore v. State*, 771 N.E.2d 46, 49 (Ind.2002) (upholding Indiana statutes that unequivocally foreclosed the right to jury sentencing after a guilty plea; finding that the defendant's guilty plea waived his entitlement to argue that the statutory scheme was unconstitutional because it deprived the defendant of a jury determination of the aggravating circumstances).

*Nunley* also declares that section 565.006.2 is constitutional as applied to Nunley because he "cannot [now] claim that the State [pursuant to section 565.006.2] deprived him of a jury, when he strategically pled guilty in order to avoid jury sentencing." *Nunley*, 341 S.W.3d 611, 622. Any assessment of whether section 565.006.2 was applied constitutionally

in Taylor's case must mirror this analysis from *Nunley*.

15. Taylor's arguments as to his counsel's failure to inform him about section 565.006.2 first were examined in his initial post-conviction proceedings before Judge Dierker. Judge Dierker's findings included: "The dead letter of [section] 565.006.2 looms large in this case, for the sole reason that, in hindsight, it is apparently the one thing that trial counsel for [Taylor] completely overlooked." Dierker Memorandum at 59. Judge Dierker noted that section 565.006.2 had not been construed in case law and never before had been invoked in Jackson County. And he noted that the statute conferred no right on Taylor to empanel a jury, but rather gave the State the authority to choose jury sentencing. Dierker Memorandum at 59–60. He found that Taylor's counsel were not ineffective for overlooking section 565.006.2, particularly because the "facts of [Taylor's] case were such that it was entirely reasonable for counsel to eschew jury involvement altogether." Dierker Memorandum at 60. He rejected Taylor's contention that his plea was involuntary because of lack of knowledge about section 565.006.2, concluding that knowledge of the statute had no bearing on Taylor's desire to avoid jury sentencing. *See* Dierker Memorandum at 60–62. Judge Dierker wrote: "The question is whether, at the time of the pleas, an awareness of [section] 565.006.2 would have changed counsel's recommenda-

invalidated because it preceded case law outlining a Sixth Amendment right to jury sentencing. When determining whether a defendant has the requisite understanding to render an "affirmative knowing, voluntary and intelligent waiver," courts do not require a defendant to know if the source of the right being waived is the constitution or a statute. Instead, the relevant assessment is whether the defendant understood the consequences of the right when he gave it up.

In *State v. Hunter,* this Court opined:

> The test for determining if the waiver is made intelligently and knowingly depends on the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. Defendant's knowledge of all relevant facts need not appear in the trial record to support a finding that the waiver ... was proper. To limit the focus of the inquiry to what a defendant said just before the waiver of counsel was permitted would forbid the broad inquiry necessary to a fair assessment of whether defendant knew and appreciated what he was doing when he waived his right to counsel.

840 S.W.2d 850, 858 (Mo. banc 1992) (discussing that a defendant's waiver of counsel was knowing and intelligent) (internal citations and quotations omitted).

In finding the defendant's waiver was sufficiently knowing and intelligent in *Hunter,* this Court noted that "the defendant understood the judge, the right being waived, the choices being made, and had

the capacity to think logically at the time he waived counsel." *Id.* at 859.

When Taylor waived jury sentencing as part of his plea in 1991, it did not matter whether his right to jury sentencing at that time stemmed from the constitution or a statute.[16] The source of Taylor's right to be sentenced by a jury was irrelevant to his strategic choice to avoid jury sentencing. The record is clear that Taylor understood that a consequence of his plea and waiver in 1991 was that he would be sentenced by a judge, not by a jury. His jury waiver was not motivated by the source of his right to be sentenced by a jury but by his strategic choice to avoid jury sentencing because of the potential harsh consequences. As discussed above, his jury waiver was not simply an adverse collateral consequence of his guilty plea. Instead, his waiver of jury participation in 1991 was a purposeful strategy to attempt to avoid the death penalty. When Taylor pleaded guilty and waived jury involvement in his case in 1991, he received what he wanted at that time—*he did not want to face a jury,* no matter under what statute or constitutional provision a right to jury sentencing existed.

The record supports a finding that Taylor made a knowing, voluntary, and intelligent waiver. He understood the judge's inquiries about his plea and waiver, he understood that his case would not be presented to a jury, and there is no argument that he was incapable at the time of thinking logically and choosing strategically to forego jury participation in his case. He acknowledged that no promises were made to him when he pleaded guilty, and

tion to plead and probably secured a different trial outcome. ... The answer is a resounding 'No!' " Dierker Memorandum at 61–62.

**16.** Comparatively, this Court's opinion regarding Taylor's co-defendant, Nunley, likewise rejects the notion that a defendant's stra-

tegic waiver of jury sentencing is invalidated retroactively by *Ring. See Nunley,* 341 S.W.3d 611, 628 ("The fact that *Ring* provided an additional source of [the right to jury sentencing] after Nunley pled guilty does not make Nunley's waiver [of jury sentencing] 'unknowing.' ").

he knew that the judge would be considering whether to sentence him to death.

Taylor's 1991 purposeful, strategic acquiescence to be sentenced by a judge, instead of by a jury, did not evaporate in light of future case law that clarified a Sixth Amendment right for capital defendants to be sentenced by a jury.

Contrary to Taylor's arguments, the United States Supreme Court's opinion in *Halbert v. Michigan*, 545 U.S. 605, 125 S.Ct. 2582, 162 L.Ed.2d 552 (2005), does not render his jury waiver invalid or require that he be allowed to evade the consequences of his 1991 jury waiver.

*Halbert* addressed a Michigan state law that provided that defendants who pleaded guilty or *nolo contendere* could appeal only by leave of the court. *Id.* at 609–10, 125 S.Ct. 2582. Under the law, indigent defendants only were provided counsel in certain situations. *Id.* at 609, 125 S.Ct. 2582. The indigent defendant in *Halbert* was informed of circumstances in which counsel may have been appointed, but he was not expressly informed that, absent such circumstances, counsel would not be provided. *Id.* at 643 n. 1, 125 S.Ct. 2582. The defendant requested appellate counsel, but his request was denied. *Id.* at 615–16, 125 S.Ct. 2582.

The United States Supreme Court ultimately found that the defendant was wrongly denied counsel, finding that Michigan's practice of providing counsel violated the Due Process and Equal Protection clauses. *Id.* at 610, 125 S.Ct. 2582. It rejected Michigan's argument that the defendant had waived his right to appointed appellate counsel by entering a plea of *nolo contendere*, finding: "At the time [the defendant] entered his plea, [he], in common with other defendants convicted on their pleas, had no recognized right to appointed appellate counsel he could elect to forgo." *Id.* at 623, 125 S.Ct. 2582. *Halbert* noted that the trial court had not informed the defendant, "simply and directly," that there would be no access to appointed counsel in his case. *Id.* at 624, 125 S.Ct. 2582.

Whereas the trial court in *Halbert* did not expressly, "simply and directly" inform the defendant of his rights, the record in Taylor's case shows that the trial court did "simply and directly" discuss with Taylor that he was foregoing jury participation in his case. Taylor was not confused about what he was foregoing, and he received the sentencing that he strategically chose. Unlike the defendant in *Halbert*, who was alleged to have impliedly waived a right to his detriment, Taylor clearly and unequivocally rejected his opportunity to have his case heard by a jury to obtain his desired judge sentencing.[17]

### b. The Sixth Amendment Jury Sentencing Cases Are Distinguishable From Taylor's Case

Because the record clearly shows that Taylor strategically waived jury sentenc-

17. Similarly, Taylor's case also is distinguishable from *Smith v. Yeager*, 393 U.S. 122, 89 S.Ct. 277, 21 L.Ed.2d 246 (1968). *Smith* involved a case in which a defendant's constitutional right had been waived but the defendant's counsel was unsure whether there was such a right and did not believe it important:

> Whatever counsel's reasons for this obscure gesture of noblesse oblige [in waiving the defendant's right to a hearing], we cannot ... presume that he intentionally relin-

quished a known right or *privilege, when the right or privilege was of doubtful existence at the time of the supposed waiver.* 393 U.S. at 126, 89 S.Ct. 277 (emphasis added).

In Taylor's case, however, there was no issue about the doubtful existence of his right to jury sentencing causing his counsel confusion, as Taylor purposefully and strategically chose judge sentencing and declined jury sentencing.

ing after weighing the costs and benefits of facing a jury, his case is distinguishable from *Apprendi, Ring, Blakely, Whitfield*, and their progeny.[18] Unlike Taylor, the defendants in these other cases did not knowingly and strategically plead guilty and waive jury sentencing based on a belief that jury sentencing would offer harsher consequences than would judge sentencing. Unlike the defendants in the other cases, Taylor strategically sought judge sentencing because he believed that judge sentencing was more likely to result in leniency or mercy.

Nothing in *Ring* or its progeny extends Sixth Amendment jury sentencing protections to defendants who strategically plead guilty and purposefully waive jury sentencing. And *Blakely* expressly recognizes that defendants can acquiesce to having their sentences imposed by a judge, rather than by a jury, and thereby waive their rights to having a jury find the facts essential for a sentence. *See* 542 U.S. at 310, 124 S.Ct. 2531.

While the defendant in *Blakely* was surprised by his enhanced sentence, Taylor knew that the judge was considering the State's recommendation for the available enhanced sentence (the death penalty), yet he still sought judge sentencing because he believed that it would be to his benefit and that jury sentencing would be to his disadvantage. As such, contrary to Taylor's arguments, it is not instructive that the defendant in *Blakely* was provided Sixth Amendment jury sentencing relief after his guilty plea, as *Blakely* did not involve a defendant who clearly, intentionally, and *strategically* waived jury sentencing because it was not in his interest.

Similarly, *Whitfield* also is not instructive in Taylor's case. In *Whitfield*, this Court held that the principles articulated in *Ring* applied retroactively to a defendant *who did not waive a jury trial* and whose sentence was imposed by a judge after the jury deadlocked during the penalty phase. *Whitfield*, 107 S.W.3d at 256. Unlike Taylor, however, the defendant in *Whitfield* made a clear choice to have his guilt and punishment decided by a jury, yet he then was denied that choice when the judge undertook to determine his punishment after the jury deadlock. *Id.* at 256, 261. Taylor, in contrast, purposefully and strategically rejected jury sentencing altogether.

Because the record clearly shows that Taylor knowingly, purposefully, and strategically avoided jury sentencing, he is not entitled to habeas relief based on the distinguishable holdings in *Apprendi, Ring, Blakely, Whitfield*, or their progeny.

### c. No Retroactive Application Of *Ring* Or Its Progeny Is Required

▆ In addition to finding that *Ring* and its progeny are distinguishable, this Court also finds that Taylor is not entitled to retroactive application of *Ring* and the other Sixth Amendment jury sentencing cases. No case law compels this Court to invalidate retroactively Taylor's 1991 agreement that he would be sentenced by a judge rather than by a jury.

In *Schriro v. Summerlin*, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), the United States Supreme Court, in an opinion published immediately before *Blakely*, declared that *Ring* did not apply retroactively in a case in which a death sentence was collaterally attacked after the sen-

---

**18.** Until Taylor's case (and his co-defendant Nunley's companion case), no other case before this Court has addressed the right to Sixth Amendment jury sentencing in a situation in which the defendant strategically pleaded guilty and waived jury sentencing because he believed that a jury would sentence him to death.

tence was final on direct review. The defendant in *Summerlin* brought a habeas petition claiming that *Ring* entitled him to relief because his pre-*Ring* death sentence was imposed by a judge rather than by a jury. *See Summerlin,* 542 U.S. at 349–51, 124 S.Ct. 2519. The Supreme Court, however, concluded:

> The right to jury trial is fundamental to our system of criminal procedure, and States are bound to enforce the Sixth Amendment's guarantees as we interpret them. **But it does not follow that, when a criminal defendant has had a full trial and one round of appeals in which the State faithfully applied the Constitution as we understood it at the time, he may nevertheless continue to litigate his claims indefinitely in hopes that we will one day have a change of heart.** *Ring* **announced a new procedural rule that does not apply retroactively to cases already final on direct review.**

*Id.* at 358, 124 S.Ct. 2519 (emphasis added).

Similarly, in *United States v. Stoltz,* the Eighth Circuit announced its conclusion that *Blakely* does not apply retroactively on collateral review of a conviction or sentence that is final. 149 Fed.Appx. 567, 568–69 (8th Cir.2005) (noting also that the Eighth Circuit had held previously that *Apprendi* does not apply retroactively in collateral proceedings). The defendant in *Stoltz,* like Taylor here, was before the court on a habeas petition raising a *Blakely* issue. *Stoltz* noted that "[a]lthough a new rule of criminal procedure announced by the Supreme Court applies to all criminal cases then pending on direct appeal, it does not apply to convictions that are already final, except in limited circumstances." *Id.* at 568. It highlighted that "[w]here a conviction is final, the new rule is retroactive only if it is either a substan-

tive rule or a watershed rule of procedure implicating the fundamental fairness and accuracy of the criminal proceeding[, and] ... [a] new procedural rule ... is fundamental only when without it the likelihood of an accurate conviction is *seriously* diminished." *Id.* (internal citations and quotations omitted). *Stoltz* found that "[t]he *Blakely* rule is not substantive because it does not alter the range of conduct or the class of persons the law punishes[, rather] it only addresses what facts a judge may use to determine a sentence," and it is not a procedural rule "of watershed magnitude." *Id.* at 569. *Stoltz* explained that "[t]he *Blakely* rule is not so fundamental to fairness that without it the likelihood of an accurate conviction or sentence is seriously diminished," and it noted that "[e]very [federal] circuit court to consider the issue has held that *Blakely* is not retroactive." *Id.*

These federal decisions rest on the United States Supreme Court's decision in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *Teague* provided that federal courts will apply new constitutional rules retroactively only if a substantive law is at issue or if a procedural law is at issue that either (1) places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe" or (2) establishes "watershed rules of criminal procedure" that "implicate the fundamental fairness of the trial" and "without which the likelihood of an accurate conviction is seriously diminished." 489 U.S. at 311–13, 109 S.Ct. 1060 (1989) (internal quotations omitted). In *Whitfield,* however, this Court decided to offer greater retroactive application of new constitutional rules over procedural matters than *Teague* would require:

> For these reasons, as a matter of state law, this Court chooses not to adopt the

*Teague* analysis but instead chooses to continue applying the *Linkletter* [*v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) ]–*Stovall* [*v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) ] approach to the issue of the retroactivity of *Ring*, an approach that comports better with Missouri's legal tradition. Applying the analysis set out in *Linkletter–Stovall* here, this Court must consider (1) the purpose to be served by the new rule, (2) the extent of reliance by law enforcement on the old rule, and (3) the effect on the administration of justice of retroactive application of the new standards.

*Whitfield,* 107 S.W.3d at 268.

In offering the defendant in *Whitfield* retroactive application of *Ring*, *Whitfield* discussed:

> [T]he second and third factors [of *Linkletter–Stovall* ] clearly favor retroactivity.... Missouri juries have always made the decision whether to impose the death penalty except in those few cases in which the jury was unable to reach a verdict. Moreover ... *Ring* must be applied to all future death penalty cases and to those not yet final or still on direct appeal.

Thus, ***only those few Missouri death penalty cases that are no longer on direct appeal and in which the jury was unable to reach a verdict and the judge made the required factual determinations and imposed the death penalty will be affected by the retroactive application of Ring.*** As a result, the effect of application of *Ring* to cases on collateral review will not cause dislocation of the judicial or prosecutorial system. This Court's preliminary review of its records has identified only five potential such cases.

*Whitfield,* 107 S.W.3d at 268–69 (listing the five cases identified, which did not include Taylor's case or his co-defendant Nunley's case) [19] (emphasis added).

By its terms, *Whitfield*'s retroactivity holding is limited to the identified similar collateral review cases in which the jury was convened but was unable to reach a verdict and then the sentence was imposed by the judge.[20] Accordingly, Taylor is not entitled to retroactive Sixth Amendment jury sentencing under *Whitfield.*

Notably, the United States Supreme Court and other federal courts have not afforded retroactive application of *Ring*

---

**19.** *Nunley* rejects retroactive Sixth Amendment jury sentencing for Taylor's co-defendant, noting that *Ring* has been applied retroactively in nine cases after *Whitfield*, but none of these cases involved a defendant who strategically pleaded guilty and waived jury sentencing. *See Nunley*, 341 S.W.3d 611, 619 (referencing *State ex rel. Lyons v. Lombardi*, 303 S.W.3d 523, 525 n. 2 (Mo. banc 2010); *Ervin v. Purkett*, 2007 WL 2782332 (E.D.Mo. 2007) at *1; *State v. Thompson*, 134 S.W.3d 32, 33 (Mo. banc 2004); *State ex rel. Baker v. Kendrick*, 136 S.W.3d 491, 494 (Mo. banc 2004); *State ex rel. Mayes v. Wiggins*, 150 S.W.3d 290, 291 (Mo. banc 2004); *State v. Buchanan*, 115 S.W.3d 841, 842 (Mo. banc 2003); *State v. Smith*, No. SC77337, order entered October 28, 2003; *State v. Richardson*, No. SC76059, order entered October 29,

2003; *State v. Morrow*, No. SC79112, order entered October 29, 2003).

**20.** The dissent states that *Whitfield* applies to Taylor's case because it provides retroactive Sixth Amendment jury sentencing rights in "all death penalty cases in which the jury was unable to agree upon the facts necessary for imposition of the death penalty." That characterization of *Whitfield*, however, takes *Whitfield*'s limited holding too far. *Whitfield* does not stand for the proposition that all defendants sentenced to death without jury findings now are entitled to retroactive relief. Where, as here, there never was a jury convened, the case does not present issues of a jury "unable to reach a verdict." *See Whitfield*, 107 S.W.3d at 268. In such a case, *Whitfield* has no application.

and its progeny. And, in light of *Whit-field*'s limited retroactively holding, this Court is not compelled to go further than the United States Supreme Court to provide Sixth Amendment jury sentencing to Taylor.

## VI. Taylor's Death Sentence Should Not Be Vacated

For the reasons addressed above, Taylor remains bound by his strategic decision in 1991 to have his sentence imposed by a judge, not by a jury. This is particularly true because he believed that judge sentencing would benefit him. He is not entitled to strategically plead guilty and waive jury sentencing and then claim that judge sentencing violated his constitutional rights. To approve such an argument would solicit game-play in criminal cases. It essentially would encourage a defendant to waive his jury rights, take his chances with a judge and then, if he does not receive the leniency he expected from the judge, later feign confusion about having waived his right to jury sentencing so he could take his chances again before a jury.

## VII. Taylor Is Not Entitled To Have His Death Sentence Reduced To Life Imprisonment

■ Taylor also contends that he is entitled to habeas relief because his death sentence violates due process and equal protection because he has been treated differently from 10 other defendants whose sentences "based on judge-found facts" were reduced from death to life without parole. But these other defendants differ from him because they did not waive jury sentencing.

■ Taylor further argues that habeas relief should issue because his death sentence is disproportionate in comparison with the life sentences imposed on similarly situated defendants. This Court, how-ever, previously has established that it will not undertake retrospective proportionality review of death sentences. *See State v. Clay*, No. SC78373 (order entered December 9, 2010) (reflecting that this Court will not undertake retroactive proportionality review of death sentences in light of *State v. Deck*, 303 S.W.3d 527 (Mo. banc 2010) (Stith, J. concurring), and *State v. Dorsey*, 318 S.W.3d 648, 659 (Mo. banc 2010)). As such, Taylor is not entitled to a new proportionality review of his death sentence.

## VIII. Conclusion

Taylor remains bound by his previous choice to forego jury sentencing, even though his choice preceded changes in the law that might have led him in hindsight to seek a different course. As this Court has noted before, "[f]inality of litigation occupies an important place in the criminal justice process ... [, and] [a]t some point litigation must cease." *State v. Thompson*, 659 S.W.2d 766, 768 (Mo. banc 1983). Taylor's criminal proceedings have been justly resolved and have reached this point of finality. His case repeatedly has been reviewed for errors, and this Court continues to find that no error was made in his case that would entitle him to relief from his sentences.

For the foregoing reasons, Taylor's petition for a writ of habeas corpus is denied.

PRICE, C.J., BRECKENRIDGE and FISCHER, JJ., concur.

STITH, J., dissents in separate opinion filed; TEITELMAN and WOLFF, JJ., concur in opinion of STITH, J.

LAURA DENVIR STITH, Judge.

I respectfully dissent. On February 8, 1991, Michael A. Taylor pleaded guilty to first-degree murder. Thereafter a judge, rather than a jury, acted as fact-finder in

his punishment phase trial. The judge determined that the facts warranted the imposition of a death sentence under section 565.030.4, RSMo 1986. In 1994, after that sentence was vacated, a different judge, after a second punishment-phase trial, again found that the facts warranted the imposition of a death sentence. In *Ring v. Arizona*, 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the United States Supreme Court thereafter held that defendants have a Sixth Amendment right to a jury determination of the facts on which guilt is based and that all defendants, including those who plead guilty, have a separate Sixth Amendment right to have a jury determine the facts necessary to impose punishment.

Applying these principles, this Court has recognized that a defendant's Sixth Amendment rights are violated when a judge, rather than the jury, finds the facts necessary for imposition of a sentence of death after the jury is unable to agree upon punishment, *State v. Whitfield*, 107 S.W.3d 253 (Mo. banc 2003), and that this ruling applies retroactively under Missouri's retroactivity principles to all death penalty cases in which the jury was unable to agree upon the facts necessary for imposition of the death penalty. *Id.* Further, in *Halbert v. Michigan*, 545 U.S. 605, 623, 125 S.Ct. 2582, 162 L.Ed.2d 552 (2005), the United States Supreme Court held that the defendant could not waive a constitutional right that was not yet recognized and was not inherently waived by a plea of guilty. Therefore, by pleading *nolo contendere*, Halbert did not waive his constitutional right to appointed counsel on first-tier appellate review, despite a Michigan statute stating that a defendant who pleads guilty or *nolo contendere* waives any right to counsel on appeal, as that right had not yet been recognized.

Based on these authorities, Mr. Taylor seeks a writ of habeas corpus arguing that his death sentence is unconstitutional because the facts necessary to impose a sentence of death were found by a judge rather than a jury. I agree with Mr. Taylor that the principles set out in *Ring, Blakely* and *Whitfield* apply here. This Court held on Mr. Taylor's prior appeal that he had no right to a jury determination of punishment as the United States Constitution as then interpreted did not provide a right to a jury determination of all facts that are essential to punishment and Missouri statutes did not give such a right to a defendant who, like Mr. Taylor, pleaded guilty. Accordingly, Mr. Taylor did not waive any right to jury sentencing. *State v. Taylor*, 929 S.W.2d 209, 217, 218–19 (Mo. banc 1996). This holding that Mr. Taylor did not have a right which he could waive and so waiver principles do not apply to him is law of the case. *State v. Deck*, 303 S.W.3d 527, 545 (Mo. banc 2010).

Now that the United States Supreme Court has held that there is a separate Sixth Amendment right to have the jury find the facts at sentencing, *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), it would violate equal protection principles to apply this Sixth Amendment right to those denied a jury determination of punishment due to a jury dead-lock but not those so denied it because they pleaded guilty. Further, the United States Supreme Court has clarified that one cannot knowingly and intelligently waive a right that has not yet been recognized. *Halbert v. Michigan*, 545 U.S. 605, 125 S.Ct. 2582, 162 L.Ed.2d 552 (2005).

Finally, even were Mr. Taylor able to waive a right he did not know he had, and even were this Court's holding that he did not waive his right to a jury determination of facts on prior appeal not law of the case,

as a factual matter he did not affirmatively waive or even know he could have had a right to a jury trial on the issue of sentence. The guilty plea transcript shows merely that he knew that by pleading guilty he would not be afforded a jury trial on punishment, not that he affirmatively wanted to avoid a jury trial on punishment or knew that he could have requested a jury trial on punishment.

Moreover, the principal opinion's reliance on excerpts of Mr. Taylor's testimony at a post-conviction motion hearing is misplaced because, in context, it is evident that Mr. Taylor was stating that he wanted to avoid a jury trial on guilt and realized that this meant that he would not be entitled to a jury trial on punishment, not that he affirmatively wished to avoid a jury trial on punishment, as the principal opinion erroneously infers.[1] As his counsel's testimony confirms, there simply was no discussion of that issue prior to his plea or the punishment-phase trial.

Mr. Taylor's testimony thereby demonstrated that he did not make an independent affirmative waiver of jury sentencing when he made the knowing choice to plead guilty. For all these reasons, I believe Mr. Taylor's death sentence must be set aside and the case sent back for a new punishment-phase jury trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 22, 1989, Michael A. Taylor and a companion abducted, raped and murdered Ann Harrison, a 15–year–old high school student. The details of that crime are set out in this Court's opinion on Mr. Taylor's prior appeal, *Taylor*, 929 S.W.2d 209.

Mr. Taylor was charged with first-degree murder. On February 8, 1991, he appeared before the Jackson County circuit court and entered a plea of guilty to the murder charge in open court and on the record. At that time, as now, section 565.006.2, RSMo 1986, provided "No defendant who pleads guilty to a homicide offense . . . shall be permitted a trial by jury on the issue of the punishment to be imposed, except by agreement of the state." At the guilty plea hearing, Mr. Taylor was questioned about this legal consequence of his plea:

> Q: Do you also understand that if you plead guilty it will be up to the Judge to decide the sentence on all charges?
>
> A: Yes.
>
> . . . .
>
> Q: Do you know that by pleading guilty here today that instead of 12 people deciding, there will only be one person deciding [on sentence], this Judge: do you understand that?
>
> A: Yes, I do.

Mr. Taylor reaffirmed his knowledge that a jury would sentence him as a result of his plea a number of additional times and that he pleaded guilty so knowing. Indeed, as this point is undisputed, the only purpose of the majority's decision to spend pages and pages quoting at length from the transcript to show this statutory waiver must be to emphasize this point just for effect, for nowhere in those many pages is Mr. Taylor told he has a separate constitutional right to jury trial, nor is he asked whether he wishes to waive that right or would do so if he were permitted to plead guilty and also have a jury trial on punishment.

---

1. In that testimony, Mr. Taylor stated that his counsel did not discuss with him whether it would be better to have a judge or jury determine punishment. Mr. Taylor and his counsel all believed that if he waived a jury trial of guilt, as they all agreed he should do in light of his confession, then he automatically lost the right to a jury trial on punishment.

This is not surprising because, without question, Missouri statutes prohibited a person such a Mr. Taylor, who said he desired to plead guilty rather than have a jury trial on guilt, from having a jury trial on punishment or the facts necessary to impose punishment. § 565.006.2. As this Court noted on prior appeal of *Taylor*, this means he had no right to a jury trial on punishment once he waived a jury trial on guilt. *Taylor*, 929 S.W.2d at 217–19. Thereafter, the circuit court conducted a punishment phase trial with the court serving as fact-finder. The circuit court sentenced Mr. Taylor to death after making the factual findings statutorily required to impose that punishment. § 565.030.4.

Mr. Taylor moved for post-conviction relief pursuant to Rule 24.035 challenging his guilty plea and sentence. He asked to be permitted to withdraw his guilty plea and to have a jury trial on guilt and sentencing because the sentencing judge had consumed alcohol at lunch before imposing a death sentence and because of other errors in his sentencing. Because of these allegations, the entire bench of the Jackson County Circuit Court recused itself from the post-conviction litigation and this Court appointed a special judge.

In his post-conviction hearing, Mr. Taylor was asked in detail about whether he had pleaded guilty because he was trying to avoid a jury trial on punishment and he believed a judge might be more lenient. He said this was not the case; that he pleaded guilty because he had confessed, so there was no point to a jury trial; and that he feared a jury would hold his confession against him in the sentencing phase if he first forced the issue of guilt to trial. But he said he was not afraid of a jury and did not know whether a judge or a jury would have been more likely to give him a death sentence, nor did his attorneys discuss this issue with him. His counsel basically confirmed his testimony.

Mr. Taylor's post-conviction testimony on this issue, in full, is as follows:

Q: In your discussions with your attorneys did you go over the way a jury would look at the evidence against you?

A. No, my attorneys and I went over the possibility of going to trial, which I told them I didn't want to go to trial.

Q. **And you didn't want to go to trial because your opinion was that this evidence would really make a jury mad?**

A. **I don't know what would have made the jury mad. I knew it was a murder, I was confessing that I did it and I didn't want to go to trial. We didn't discuss that in a debate.**

Q. Did you discuss the likelihood of receiving a death sentence if you went in front of a jury?

A. Yes.

Q. And your opinion as to the likelihood of receiving a death sentence was that it would be very high?

A. I really couldn't answer that.

Q. Well, did you think that your chances of not getting death were real good in front of a jury?

A. **I knew that I didn't want to go in front of a jury.**

Q. **And why was that, Mr. Taylor?**

A. **Because I was admitting to my guilt.**

Q. **I'm not talking about the issue of guilt, I'm talking about the issue of punishment. Did you want to go in front of a jury for them to decide whether you would live or die?**

A. Not then but now I do.

Q. And why didn't you want to then?

A. Because I was admitting my guilt.

Q. Do you understand that under any circumstances no matter what happens in this case nothing can take away that videotaped confession that you've admitted to?

A. Yes.

Q. So no matter what happens you have already admitted your guilt, do you understand that?

A. Yes.

Q. So let me ask you, why is it that you avoided a jury in your decision that you made when you decided to plead in front of Judge Randall? What was it that you were afraid of in front of a jury?

A. It wasn't that I was afraid, it just didn't—I preferred not to go to a jury trial.

Q. Did you have any doubt in your mind that a jury would sentence you to death?

A. Did I have any doubt? I didn't know.

Q. You didn't have an opinion, is what you're telling us under oath, as to what a jury would do?

A. I can't answer that because I'm not the jury. I mean, I would hope that they would understand me accepting—my willingness to admit that I committed this crime and have mercy.

Q. Is the way that you were raised that if you commit a crime and you get caught and you say, "I did it," that that erases punishment?

A. No, it's not.

Q. Okay. And your testimony before this Judge is that you don't recall any discussions with your attor- neys about the likelihood of re- ceiving death in front of a jury?

A. No.

Q. You don't recall and you're tell- ing us under oath in front of this Judge that you don't recall any real discussions about the death penalty likelihood at all?

A. We discussed the issues concern- ing the First Degree Murder charge of life without parole and possibility of the death penalty. But as far as discussing what I probably would get going to a jury, we really didn't discuss that.

Q. Why did you decide to plead in front of a Judge? Why did you want to plead in front of Judge Meyers?

A. Because of my videotaped state- ment.

Q. Did you think that the Judge would be more or less likely to give a death penalty than a jury?

A. I really don't know.

Q. So you just really didn't know any- thing about this?

A. Yes, I did. I knew that I was ad- mitting to my guilt.

Q. Well, I think we've accepted—ev- erybody's accepted that you're guilty of Murder First Degree, Armed Criminal Action, Kidnapping and Rape. The issue is punishment. You had no discussions, no opin- ion as to the relative benefits be- tween a Judge or jury for punish- ment, is that what you're telling us?

A. Yes.

(emphasis added). As the above complete quotation of Mr. Taylor's testimony dem- onstrates, when considered in context, his comments did not imply that he purposely avoided a jury trial of punishment but in

fact showed that it was a jury trial of guilt he wanted to avoid; he was not even aware that there was an option of a jury trial of punishment.

Mr. Taylor's counsel confirmed that they had not discussed with him the possibility that he could seek a jury trial of punishment even if he pleaded guilty. Counsel Martin McLain testified that he was unaware that section 565.006 gave the State an option to agree to a jury trial of punishment even if defendant pleaded guilty, and so he never told Mr. Taylor there was a third option to either a complete jury trial or a complete judge trial—pleading guilty and then seeking jury sentencing. Mr. McClain's "memory was the choice was between the jury and pleading guilty and having the Judge sentence." Mr. McClain said that he recommended going to trial before Judge Meyers or Judge Randall as he thought Mr. Taylor had a better chance with a judge than with a jury. In particular, Mr. McClain "discussed with Mr. Taylor that [he] believed that the videotaped confession would be very damaging at a guilt phase proceeding." They concentrated on how a jury would react if he contested guilt and went to trial, and in light of the facts, the publicity, and his confession they thought a "jury would convict him" if he went to trial and that as a consequence "a death sentence was more likely than not."

Mr. McClain "was concerned with how bad the confession would look to a jury of twelve and how bad it would look that [they] were contesting his guilt when he had made that confession." Mr. McClain was "not familiar of a case where someone went in and said they were guilty and asked the jury for leniency at any kind of a sentencing proceeding." Mr. Taylor did not learn from him that there was a chance that he could plead guilty and then ask for jury sentencing.

Co-counsel was Leslie Delk. She, too, confirmed that because "the evidence clearly was not good," she told Mr. Taylor to plead guilty before Judge Meyers and later Judge Randall. But, while she was aware of section 565.006 due to the post-conviction litigation, she did not discuss with Mr. Taylor that section 565.006 gave a defendant a right to plead guilty and then ask the prosecutor to agree to jury sentencing. She could not say what she would have done had she known of this possibility. Some of the same factors that led her to recommend that Mr. Taylor plead guilty would have led her to recommend judge sentencing. But, there were other factors that favored jury sentencing, particularly Mr. Taylor's remorse and his family support, which would both be strong mitigators. Ms. Delk failed to discuss any of this with him and testified that she failed in her obligation to advise him of all of his options.

These failures of counsel may be explained by the fact that Ms. Delk was required to leave the public defender system a short time after the guilty plea and before sentencing and only continued representing Mr. Taylor by court appointment, and that prior to the plea, Mr. McClain quit to take another job and was working on the case from Florida, while extremely ill. Both admitted they did not spend the time on the case that they wished. The only other person assigned to the case was a paralegal who had been employed by the public defender system, as her first job, for only six months. None of them discussed with Mr. Taylor an option of pleading guilty and trying punishment to a jury. The judge nonetheless denied post-conviction relief.

Mr. Taylor then brought to this Court a consolidated appeal challenging the guilty plea, the imposition of the death penalty and the overruling of the Rule 24.035 mo-

tion for post-conviction relief. On June 29, 1993, after the appeal had been briefed and argued, this Court did not issue an opinion considering the merits of any of these rulings but rather issued its order vacating the judgment below, stating: "Judgment vacated. Cause remanded for new penalty hearing, imposition of sentence, and entry of new judgment."

On remand, a new trial judge was assigned to hear the retrial of the punishment phase. Thereafter, on January 11, 1994, Mr. Taylor again filed a motion in the trial court to withdraw his guilty plea. This motion again was overruled. Mr. Taylor also requested that a jury be the fact-finder in the punishment phase trial, but the request was denied. Mr. Taylor's second punishment phase trial began May 2, 1994. Following the trial, the trial court made oral and written findings that the state had proved six statutory aggravating circumstances beyond a reasonable doubt as well as three non-statutory aggravating circumstances. The judge found the existence of one mitigating circumstance, rejecting several others offered by Mr. Taylor, and found that the mitigating circumstance did not outweigh the aggravating circumstances. The judge then concluded that the aggravating circumstances warranted a death sentence.[2]

In September 1994, Mr. Taylor filed a motion for post-conviction relief pursuant to Rule 24.035, challenging his guilty plea and challenging his second sentencing proceeding and sentence of death. The circuit court overruled the motion in an order accompanied with findings of fact and conclusions of law.

Mr. Taylor then brought a consolidated appeal limited to this Court's mandatory proportionality review, § 565.035.5, RSMo 1994, and review of the overruling of the motion to withdraw plea and the denial of post-conviction relief. This Court affirmed in *Taylor*, 929 S.W.2d 209. This Court there rejected Mr. Taylor's argument that he had a right to but was denied a jury trial on the issue of punishment on remand. In so doing, this Court stated that "where a defendant previously had a right to have a jury impose sentence, section 565.035.5(3) does allow 'a new jury' to be selected for purposes of imposing sentence." *Id.* at 219. But, "section 565.035.5(3) does not provide a defendant a right to a jury trial on the imposition of sentence where such a right did not exist prior to remand."[3] *Id.*

*Taylor* therefore made the propriety of allowing a judge rather than a jury determine the facts necessary for punishment at Mr. Taylor's second trial dependent on whether Mr. Taylor had a right to have a jury conduct sentencing fact-finding at the time of his initial trial. *Taylor* stated that under the United States Supreme Court's

---

**2.** Mr. Taylor also received consecutive terms of 50 years for armed criminal action, 15 years for kidnapping and life imprisonment for rape.

**3.** Section 565.035.5(3), RSMo 2000 (emphasis added), states:

5. The supreme court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the supreme court, with regard to review of death sentences, shall be authorized to:

. . . .

(3) Set the sentence aside and remand the case for retrial of the punishment hearing. *A new jury shall be selected* or a jury may be waived by agreement of both parties and then the punishment trial shall proceed in accordance with this chapter, with the exception that the evidence of the guilty verdict shall be admissible in the new trial together with the official transcript of any testimony and evidence properly admitted in each stage of the original trial where relevant to determine punishment.

decision in *Spaziano v. Florida,* 468 U.S. 447, 460, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), a " '*defendant has no constitutional right to have a jury assess punishment.*' " *Taylor,* 929 S.W.2d at 219, quoting, *State v. Hunter,* 840 S.W.2d 850, 863 (Mo. banc 1992) (emphasis added). Therefore, if Mr. Taylor had a right to a jury trial on punishment, it would have to be based on Missouri statutes. But, *Taylor* held, it is "obvious from the language of" section 565.006.2 that a defendant who pleads guilty has no statutory right to jury sentencing. Therefore:

> *jury sentencing after a guilty plea is not a right for the defendant to waive,* rather a privilege for the State to grant. *Taylor did not waive sentencing by a jury* because he could only obtain jury sentencing if the State agreed to it. The State did not agree. Therefore, there was nothing of which to inform him.

*Taylor,* 929 S.W.2d at 217 (emphasis added). *Taylor* concluded that "section 565.035.5(3) does not entitle Taylor to 'a new jury' for imposition of punishment because he never obtained nor possessed the right to a jury for imposition of punishment prior to this Court's remand order." *Id.* at 219. This Court affirmed Taylor's death sentence. *Id.*

Mr. Taylor now petitions for habeas relief arguing that, under cases decided since this Court denied his appeal and motion for post-conviction relief, he is entitled to have his death sentence set aside and to have a sentence of life imprisonment imposed or, alternatively, is entitled to a jury trial on punishment. The majority rejects Mr. Taylor's habeas claim, concluding, *inter alia,* that Mr. Taylor purposefully waived his retroactive right to jury determination of the facts necessary to impose death. For the reasons discussed below, I disagree.

## II. MR. TAYLOR IS ENTITLED TO HABEAS RELIEF

### A. Defendants Who Plead Guilty Have a Sixth Amendment Right to Jury Fact–Finding Necessary to Impose Death

Mr. Taylor contends that he is entitled to habeas relief under the United States Supreme Court's decisions in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Ring* and *Blakely.* These decisions were handed down by the United States Supreme Court only after Mr. Taylor's death sentence was affirmed by this Court in *State v. Taylor,* 929 S.W.2d 209 (1996). These cases, he argues, rejected this Court's stated premise in *Taylor* that a "defendant has no constitutional right to have a jury assess punishment," 929 S.W.2d at 219. I agree.

*Apprendi* held that under the Sixth Amendment, as applied to the states under the Fourteenth Amendment, any fact, except the fact of prior conviction, that increases the penalty for a crime beyond the maximum allowed by the facts found by the jury also must be submitted to the jury and proven beyond a reasonable doubt. 530 U.S. at 476, 120 S.Ct. 2348. *Ring* made clear that in a capital case this means, "Capital defendants are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589, 122 S.Ct. 2428. "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Id.* at 602, 122 S.Ct. 2428. The only exception is when the increase is conditioned on the existence of prior convictions; those findings need not be made by the jury. *Id.* at 597 n. 4, 600, 122 S.Ct. 2428.

In reaching its holding in *Ring*, the Supreme Court expressly overruled *Walton v. Arizona*, 497 U.S. 639, 649, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), which had held that there is no Sixth Amendment violation where a judge finds an aggravating factor because aggravating factors are mere sentencing considerations, not "element[s] of the offense of capital murder."

The United States Supreme Court reaffirmed *Ring* in *Blakely* v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). It clarified that the Sixth Amendment right to jury fact-finding as to punishment is separate from the right to a jury trial on guilt, and, although a particular defendant is free to choose not to take advantage of that right, as when that defendant makes a knowing, intelligent and voluntary waiver of that constitutional right, otherwise the right to a jury determination of punishment applies even if a defendant has pleaded guilty, because the right to jury fact-finding "is no mere procedural formality, but a fundamental reservation of power in our constitutional structure." *Blakely*, 542 U.S. at 305–06, 124 S.Ct. 2531.

A year after *Ring*, this Court set aside Joseph Whitfield's death sentence (which it had affirmed on appeal before *Ring* was decided) "because the judge rather than the jury made the factual determinations on which his eligibility for the death sen-

tence was predicated." 107 S.W.3d at 256. The judge had determined the factual issues necessary for imposition of the death penalty in *Whitfield* because after finding Mr. Whitfield guilty of first-degree murder, the jury was unable to reach a verdict in the punishment phase. In the punishment phase, the jury was required to impose a life sentence unless it made three specific findings beyond a reasonable doubt: (1) at least one statutory aggravating factor was present in the defendant's case; (2) the aggravating evidence "warrant[ed] imposing the death sentence"; and (3) any mitigating evidence was not "sufficient to outweigh the evidence in aggravation of punishment found by the trier."[4] § 565.030.4, RSMo 1994. As the *Whitfield* jury was unable to agree on punishment, the trial judge conducted the section 565.030.4 step-by-step analysis and imposed the death penalty. In this way, the judge rather than the jury found the essential facts under section 565.030.4 to impose death.

This was error for, as this Court specifically held in affirming Mr. Whitfield's initial appeal in 1992, *State v. Whitfield*, 837 S.W.2d 503, 514–15 (Mo. banc 1992), steps 1, 2 and 3 of the statute set out required factual findings the jury must make to impose death. In the absence of any one of these findings, the jury must impose life. As such, the statute gives no discretion to

---

**4.** Even if the jury made these three specific findings, it could decide to recommend a life sentence if it "decide[d] under all the circumstances not to assess and declare the punishment of death." § 565.030.4(4), RSMo 1994. The jury's discretion to exercise mercy pursuant to section 565.030.4(4) is not considered a "fact" that a jury must find under *Ring*. Section 565.030.4, originally contained in RSMo 1986, was amended, mostly cosmetically, in 1993. 1993 H.B. 562. This is the version of the statute at issue in Mr. Taylor's case. Section 565.030.4 was amended once more in 2001, 2001 S.B. 267, this is the

version of the statute that is presently in effect. 565.030.4, RSMo Supp.2010. The penalty phase procedure under the current version of section 565.030.4 still calls for the fact-finder to find at least one statutory aggravator and to decide whether the mitigating evidence outweighs the aggravating evidence (it also retains the section 565.030.4(4) mercy provision) but it added a requirement to determine whether the defendant is mentally retarded and abolished the jury's obligation to decide whether the aggravating factor or factors warrant imposing the death sentence. *Id.*

the jury—it must impose a life sentence unless it makes each of these factual findings in favor of the state. *Id.* For this reason, in its 2003 *Whitfield* decision, this Court held it "clearly violated the requirement of *Ring* that the jury rather than the judge determine the facts on which the death penalty is based." *Whitfield,* 107 S.W.3d at 262; *accord, People v. Montour,* 157 P.3d 489, 496 (Colo.2007) ("in the death penalty context, the facts essential to punishment that fall under the *Apprendi–Ring–Blakely* rule consist of those facts needed to make a death penalty determination," including finding aggravating circumstances, finding mitigating circumstances, and weighing all of these circumstances).

*Whitfield* then observed that the burden shifted to the State to show that the *Ring* error was harmless and that the State could not carry its burden because there was no way to know, based on the jury deadlock, whether the jury's impasse came at step 2 or 3, which *Ring* requires a jury to find, or if it came at the point where the jury considers whether to give mercy under section 565.030.4(4)—a determination that a judge may make. *Whitfield,* 107 S.W.3d at 262–64.

## B. Ring Applies Retroactively

*Whitfield* also determined that the Sixth Amendment right to have a jury determine all the facts necessary to impose punishment recognized in *Apprendi, Ring* and *Blakely* would apply retroactively to cases on collateral review under the three-part *Linkletter–Stovall* retroactivity analysis long used in Missouri. *Whitfield,* 107 S.W.3d at 266, 268, citing, *Spidle v. State,* 446 S.W.2d 793 (Mo.1969); *State v. Ussery,* 452 S.W.2d 146 (Mo.1970); *McCulley v. State,* 486 S.W.2d 419 (Mo.1972).[5]

Missouri's *Linkletter–Stovall* retroactivity analysis requires a court to determine retroactivity by considering: "(1) the purpose to be served by the new rule, (2) the extent of reliance by law enforcement on the old rule, and (3) the effect on the administration of justice of retroactive application of the new standards." *Whitfield,* 107 S.W.3d at 268. *Whitfield* held that consideration of the three *Linkletter–Stovall* factors required retroactive application of the Sixth Amendment right to have a jury rather than a judge determine the facts necessary for imposition of the death penalty. In so doing, *Whitfield* noted that "the purpose to be served by the rule set out in *Ring* is to ensure a jury of defendant's peers finds each of the factual elements necessary to his conviction and sentence of death." *Id.*

5. In *Danforth v. Minnesota,* 552 U.S. 264, 289, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008), the United States Supreme Court cited with approval *Whitfield*'s statement that Missouri could adhere to *Linkletter–Stovall,* holding that "the *Teague* decision limits the kinds of constitutional violations that will entitle an individual to relief on federal habeas, but does not in any way limit the authority of a state court, when reviewing its own state criminal convictions, to provide a remedy for a violation that is deemed 'nonretroactive' under *Teague.*" 552 U.S. at 282, 128 S.Ct. 1029. *Danforth* noted that both before and after *Teague* commentators had advanced "the proposition that state courts may apply new constitutional standards in a broader range of cases than is required by this Court's decision not to apply the standards retroactively." *Id.* at 277 n. 14, 128 S.Ct. 1029 (internal quotations and alterations omitted), *citing* Stith, *A Contrast of State and Federal Court Authority to Grant Habeas Relief,* 38 Val. U.L.Rev. 421, 443 (2004). The Supreme Court concluded, "It is thus abundantly clear that the *Teague* rule of nonretroactivity ... was intended to limit the authority of federal courts to overturn state convictions—not to limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own State's convictions." 552 U.S. at 280–81, 128 S.Ct. 1029.

*Whitfield* also noted that the extent of reliance by law enforcement on the old rule was small and the effect on the administration of justice of applying the new rule would be minimal, as the number of affected cases would be small, because "in Missouri juries have always made the decision whether to impose the death penalty except in those few cases in which the jury was unable to reach a verdict." *Id. Whitfield* itself identified five such cases in addition to *Whitfield* but recognized that a small number of other similar cases might later be identified and that the retroactivity analysis necessarily also would be applied to them. *Id.* at 269.

In the ensuing years, a number of additional cases, some pending and some no longer pending or on collateral review, have been identified in which a judge rather than a jury found the facts necessary to impose punishment. The *Apprendi–Ring–Blakely* analysis has been applied to each of them, as required by *Whitfield.* As this Court described the principle in applying *Whitfield* in *State ex rel. Baker v. Kendrick,* 136 S.W.3d 491 (Mo. banc 2004), which was pending at the time that *Whitfield* was decided:

> Because this case was tried after the United States Supreme Court decided *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the princi-

ples set out in *Ring* must be applied to it. As stated in *Whitfield,* this means that, where, as here, the jury was unable to agree on punishment and the record fails to show that the jury found all facts necessary to impose a sentence of death, the trial court's only authority was to enter a sentence of life imprisonment without possibility of probation or parole.

*Id.* at 491.[6]

Mr. Taylor correctly notes that he presents yet another of these cases in which a judge rather than a jury determined the facts necessary to impose a death sentence and that he too is entitled under *Apprendi–Ring–Blakely–Whitfield* to have his death sentence set aside. He argues that, having determined in *Whitfield* that the right to have a jury determine the facts necessary to punishment applies retroactively, the state cannot pick and choose to which defendants or in which fact situations that right will be retroactively applied without violating equal protection principles.

I agree. Indeed, the state concedes in its brief that "[t]here is no dispute that *Ring* ... applies retroactively to Missouri cases under *State v. Whitfield* ...". The reason for this concession is evident. While in his case a jury deadlock was not

---

**6.** *Accord, State ex rel. Mayes v. Wiggins,* 150 S.W.3d 290, 291–92 (Mo. banc 2004) (again ordering judge in pending case in which jury deadlocked that *Whitfield* required imposition of life sentence); *State v. Thompson,* 134 S.W.3d 32, 33 (Mo. banc 2004) (mandate recalled and court ordered to impose sentence of life imprisonment after jury deadlocked, in light of *Ring* and *Whitfield* ). In addition to these cases, *Whitfield* has been applied to order a judge to impose a life sentence in cases no longer pending or on review in *State v. Buchanan,* 115 S.W.3d 841, 842 (Mo. banc 2003) (stating defendant "correctly claims that a jury rather than a judge is required to determine each fact on which the legislature

conditioned an increase in the maximum punishment"), *State ex rel. Lyons v. Lombardi,* 303 S.W.3d 523, 525 n. 2 (Mo. banc 2010) (noting that death sentence for Lyons had been set aside in August 2007 because "the jury failed to set out findings necessary to impose death"), as well as in *Ervin v. Purkett,* 2007 WL 2782332, at *7 (E.D.Mo. Sept. 21, 2007); *Richardson v. State,* No. 76059, *Order Recalling Mandate and Setting Aside Death Sentence* (Oct. 29, 2003); *Morrow v. State,* No. 79112, *Order Recalling Mandate and Setting Aside Death Sentence* (Oct. 29, 2003); *Smith v. State,* No. 77337, *Order Recalling Mandate and Vacating Death Sentence* (Oct. 28, 2003).

the reason that a judge imposed punishment, *Ring* and its progeny were not based on jury deadlock. In fact, *Ring* itself did not involve a jury deadlock. Rather, it involved a jury verdict of guilt, but the judge then found additional facts that justified an increase in punishment over that which would have been authorized by the charge submitted to the jury. It was this additional fact-finding that *Ring* found improper. 536 U.S. at 592–93, 122 S.Ct. 2428. Likewise, neither *Apprendi* nor *Blakely* involved a deadlocked jury—the defendants in both of those cases first pleaded guilty and thereafter sentences were imposed based on judge-found facts. *Apprendi*, 530 U.S. at 470–71, 120 S.Ct. 2348; *Blakely*, 542 U.S. at 300–01, 124 S.Ct. 2531.

Therefore, it is settled that the Sixth Amendment right is to have a jury determine the facts necessary to impose punishment, whatever the context in which that right was denied. In *Whitfield* and the other Missouri cases that the courts have considered to date, that context was a jury deadlock resulting in judge sentencing.[7] *Whitfield* held that it would not deviate from Missouri's traditional *Linkletter–Stovall* test for retroactivity and that under that test the Sixth Amendment right to have a jury determine the facts necessary to impose punishment applied retroactively to those whose sentence had been imposed based on facts found by a judge. *Whitfield*, 107 S.W.3d at 268.

The majority argues that the above retroactivity analysis is irrelevant because the facts of this case are different, in that Mr. Taylor did not get sentenced to death after the jury was unable to agree on punishment but instead pleaded guilty without knowing he had a right to a jury trial on the facts necessary to impose death. While this factual distinction is present, it does not affect the retroactivity analysis, for in all legally relevant respects, Mr. Taylor is in the same position, in that he was denied a jury trial of the facts underlying punishment in violation of *Apprendi–Ring–Blakely*, just as in *Whitfield* and the other cases cited.

Having chosen in *Whitfield* to retroactively apply the right to have a jury determine the facts necessary to punishment, this Court must do so uniformly to all similarly situated persons:

> It is the general doctrine that the law, relative to those who may be charged and convicted of crime, as well as the punishment to be inflicted therefore, shall operate equally upon every citizen or inhabitant of this state."

*State v. O'Malley*, 342 Mo. 641, 117 S.W.2d 319, 325 (1938). *O'Malley* held it unconstitutional to allow ballot records to be preserved and used against those committing fraud in cities of more than 100,000 inhabitants for a longer period than against those committing fraud in smaller communities, stating:

> Every one has a right to demand that he be governed by general rules, and a special statute which, without his consent, singles his case out as one to be regulated by a different law from that which is applied in all similar cases, would not be legitimate legislation, but would be such an arbitrary mandate as

---

7. The parties seem to agree that there are only two other cases in which a death sentence was imposed by a judge based on facts found by the judge after a guilty plea, *State v. Nunley*, 923 S.W.2d 911 (Mo. banc 1996), and *State v. Worthington*, 8 S.W.3d 83 (Mo. banc 1999). Whether this remains an issue in *Wor-*

*thington* is unclear; the federal district court's holding that Mr. Worthington's death sentence should be set aside on ineffective assistance of counsel grounds, *Worthington v. Roper*, 619 F.Supp.2d 661 (E.D.Mo.2009), is now on review in the Eighth Circuit.

is not within the province of free governments.

*Id.*

Similarly, in *State v. Baker*, 524 S.W.2d 122 (Mo. banc 1975), this Court held that a statute that mandated consecutive sentences for defendants convicted of two crimes, but did so only if they had not yet been sentenced for either crime, violated equal protection because the chronological order in which they were sentenced was immaterial to the reasons why a consecutive sentence might be appropriate. For this reason, for equal protection purposes, they were similarly situated and must be similarly treated, for "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." *Id.* at 129.

As noted in *Smith v. State*, 680 S.W.2d 412, 413 (Mo.App.1984), citing *State v. Brown*, 554 S.W.2d 574 (Mo.App.1977), "[s]ubsequent cases applied *Baker* retroactively and required that all defendants sentenced under its guidelines must be resentenced." *See also State v. Davis*, 765 S.W.2d 603, 605–06 (Mo. banc 1989) (equal protection requires equal treatment of those similarly situated and discrimination based "upon a ground wholly irrelevant to the achievement of the legislative objective" violates equal protection principles).

To allow defendants who plead guilty, such as Mr. Taylor, to be singled out and deprived of the right to jury determination of the facts on which punishment is based runs afoul of this basic principle of equal treatment. As the Ninth Circuit has stated the point in holding that the California Supreme Court would violate the equal protection clause if it gave one class of persons but not another the benefit of retroactive application of its rule providing defendants a right to an impartial jury:

The equal protection clause prohibits a state from affording one person (other than the litigant whose case is the vehicle for the promulgation of a new rule) the retroactive benefit of a ruling on a state constitution's right to an impartial jury while denying it to another.

*Myers v. Ylst*, 897 F.2d 417, 421 (9th Cir. 1990).

Similarly in *LaRue v. McCarthy*, 833 F.2d 140 (9th Cir.1987), the Ninth Circuit held that California could not pick and chose those to whom it would retroactively apply a rule that prohibited basing felony murder charges on child abuse. Rather, the state must apply its rule retroactively in all cases or in none because "once a state has established a rule it must be applied evenhandedly." *Id.* at 142, citing, *Johnson v. Arizona*, 462 F.2d 1352, 1354 (9th Cir.1972). *Johnson* had held that Arizona could not apply a decision striking down determinant sentences retroactively in some cases but not all without violating equal protection principles. *Id.* at 1354.

Other courts are in accord. *Hill v. Roberts*, 793 F.Supp. 1044 (D.Ks.1992), stated that a state is free to choose whether to apply many constitutional rules retroactively. But, it said:

The equal protection clause clearly prohibits a state from affording one person the retroactive benefit of a ruling and denying it to another who is similarly situated.

*Id.* at 1046. To the contrary, "once a state establishes a new rule, it must be applied evenhandedly." *Id. Hill* found that the state had applied its new rule only to pending cases and, therefore, had not violated the equal protection clause.

Here, unlike in *Hill*, this Court *has* applied its new rule retroactively to cases that were not pending at the time of the new rule. It cannot now choose not to

apply it retroactively to some but not other cases in which that Sixth Amendment right was violated. While the particular reasons that Mr. Taylor and Mr. Whitfield were denied jury sentencing—a guilty plea as opposed to a hung jury—may be different, they are similarly situated insofar as the Sixth Amendment right to a jury determination of the facts on which punishment is based is concerned.

*Apprendi, Ring, Blakely* and *Whitfield* all involved very different fact situations, but all reached the same result because, in the only relevant respect, all were identical—in each the defendant was denied a jury determination of the facts necessary for punishment. *Ring* states that allowing a judge rather than a jury to find the facts necessary to impose death violates a defendant's Sixth Amendment right to jury trial. *Blakely* says that this principle extends to situations in which a defendant has pleaded guilty. Even in the case of a plea agreement, therefore, the state cannot violate the defendant's Sixth Amendment right to jury trial on all facts necessary to impose a sentence.

Here, Mr. Taylor did not receive a jury trial on punishment, although he had a right to a jury determination of the facts necessary to impose the death penalty. As this Court noted on the prior appeal of this case in discussing the statutory right to jury trial, where "a defendant previously had a right to have a jury impose sentence, section 565.035.5(3) does allow 'a new jury' to be selected for purposes of imposing sentence." *Taylor,* 929 S.W.2d at 219. Mr. Taylor was denied this right here.

*C. Mr. Taylor Did Not Waive A Right to Have a Jury Determine the Facts Necessary to Punishment By Pleading Guilty*

The State does not disagree that *Ring* and *Whitfield* would apply retroactively here if Mr. Taylor had asked for but been denied a jury trial on the facts necessary

to impose punishment. It instead bases its position that Mr. Taylor's death sentence should not be set aside on the assertion that Mr. Taylor waived any statutory right to jury sentencing by pleading guilty in 1991 and that in doing so he should be held also to have waived any constitutional right to jury sentencing. For this reason, the majority quotes at length from the guilty plea hearing transcript to show Mr. Taylor knew that by pleading guilty he would not receive a jury trial on the facts necessary to impose punishment. That issue is not in doubt; however, it simply is not the relevant question.

I agree with the State that a defendant *may* choose to make a knowing, voluntary and intelligent waiver of his constitutional right to a jury determination of the facts necessary to impose a sentence, just as a defendant *may* choose to make a knowing, voluntary and intelligent waiver of his right to a jury trial on guilt. This legal issue is not controverted by any party, nor could it be. Further, nothing has been cited that requires a trial court to accept a guilty plea; therefore, there is nothing that appears to prohibit a court from refusing to accept such a plea from a defendant who has demanded jury sentencing.

But, in Mr. Taylor's case, a jury trial on punishment was not denied based on an affirmative knowing, voluntary and intelligent waiver of Mr. Taylor's Sixth Amendment right to jury fact-finding. Neither did the trial court refuse to accept Mr. Taylor's guilty plea because Mr. Taylor wanted a jury trial on the facts on which punishment would be based. To the contrary, Mr. Taylor was denied a jury trial solely based on the fact that section 565.006.2 barred him from being allowed a jury trial on punishment because he pleaded guilty.

Mr. Taylor agrees that he *acknowledged* his awareness that this was the effect of section 565.006.2 and, so, that by pleading guilty he knew he would try the punishment phase before a judge, not a jury. His counsel also knew this was the effect of his plea.

But, Mr. Taylor says, he did not agree to legally *waive* any such right, for there was no statutory right under section 565.006.2 for him to waive. And, even were there such a right, he did not and could not have waived his *constitutional* right to a jury determination of the facts necessary to impose the sentence. This is because, contrary to the state's unsupported opposing argument, and as *Taylor* itself expressly recognized, no such Sixth Amendment right had been recognized at the time of his plea. 929 S.W.2d at 219. As *Taylor* noted in regard to the statutory right to a jury trial, Mr. Taylor could not waive a right he did not have. *Id.* Moreover, the transcript of the post-conviction motion hearing makes it clear that his counsel did not inform him that he could have a jury trial of punishment if he pleaded guilty, for they did not believe this legally was allowed.

After this Court's ruling in *Taylor*, the United States Supreme Court held that defendants do have an independent, Sixth Amendment right to jury fact-finding as to any fact that increases the penalty for a crime beyond the maximum a judge may impose based solely on the facts admitted by the defendant in his guilty plea. *Blakely*, 542 U.S. at 304, 124 S.Ct. 2531. But, the concept set out in *Taylor* that one cannot waive a right that does not exist or has not been recognized is consistent with the United States Supreme Court's approach to the concept of waiver in other cases in which it has been alleged that a defendant had waived a constitutional right by pleading guilty.

Waiver is "an intentional relinquishment or abandonment of a *known* right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (emphasis added). A waiver of a constitutional right must be made "knowingly and intelligently." *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Courts are to "indulge in every reasonable presumption against waiver." *Zerbst*, 304 U.S. at 464, 58 S.Ct. 1019. "The law ordinarily considers a waiver knowing, intelligent and sufficiently aware if the defendant understands the nature of the right and how it would apply in general in the circumstances ...". *Iowa v. Tovar*, 541 U.S. 77, 91, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004).

The State says that by acknowledging he would not receive a jury trial on punishment if he pleaded guilty, he waived the as yet unknown constitutional right to have a jury determine the facts necessary to punishment as well, even though he was not aware of its existence. But, the State cites no law saying that one can knowingly, intelligently and voluntarily relinquish a right that has not yet been established.

Two United States Supreme Court cases are directly on point, however, and state that such a waiver is not permissible. *Smith v. Yeager*, 393 U.S. 122, 89 S.Ct. 277, 21 L.Ed.2d 246 (1968), involving a state prisoner's right to an evidentiary hearing on a petition for federal habeas corpus, rejects a very similar argument. At the time the petitioner first sought federal habeas corpus in 1961, *Brown v. Allen*, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), was the controlling law. Under it, the district court believed that the petitioner had no entitlement to an evidentiary hearing on the federal habeas petition. Petitioner's counsel agreed, stating that they did not need one anyway. After the decision in *Townsend v. Sain*, 372 U.S.

293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), expanded the right of habeas petitioners to an evidentiary hearing, the petitioner again sought habeas relief: The federal court of appeals held that his attorney had waived petitioner's right to an evidentiary hearing in the 1961 proceeding. The Supreme Court reversed, stating that the fact that counsel said he was not sure whether there was a right to such a hearing but that he relinquished it did not constitute a waiver, for:

> Whatever counsel's reasons for this obscure gesture of noblesse oblige, *we cannot now ... presume that he intentionally relinquished a known right or privilege,* Johnson v. Zerbst, 304 U.S. 458, 464 (58 S.Ct. 1019, 82 L.Ed. 1461), *when the right or privilege was of doubtful existence at the time of the supposed waiver.*

*Yeager,* 393 U.S. at 125, 89 S.Ct. 277 (emphasis added). The majority's attempt to distinguish *Yeager* on the basis that here it was definitely known that there was no *statutory* right confuses the very point at issue here—that everyone believed there was no parallel constitutional right, indeed *Walton v. Arizona,* 497 U.S. 639, 649, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), specifically had so held, and therefore that right could not have been waived even if the statutory right was waived.

This is the very concept underlying the Supreme Court's recent reaffirmation of the principle that one cannot waive a future right not yet recognized in *Halbert v. Michigan,* 545 U.S. 605, 125 S.Ct. 2582, 162 L.Ed.2d 552 (2005). *Halbert* noted that the governing Michigan law provided that an accused who pleaded guilty or *nolo contendere* could appeal by leave of the court only and that, in most circumstances, counsel would not be provided to assist indigents in applying for leave to appeal. The petitioner pleaded *nolo contendere* and was denied appointment of counsel to assist him in applying for leave to appeal to the Michigan Court of Appeals. *Id.* at 614, 125 S.Ct. 2582. *Halbert* rejected Michigan's argument that it was not required to provide counsel for indigents who were seeking leave to appeal, holding that the due process and equal protection clauses require the appointment of counsel for defendants, convicted on their pleas; who seek access to first-tier discretionary appellate review.

The state of Michigan alternatively contended that even if there were a constitutional right to have counsel appointed to represent defendant when he sought leave to appeal, the petitioner in *Halbert* necessarily waived that right because he knew that a Michigan statute provided that a defendant who pleads guilty or *nolo contendere* will not receive the assistance of counsel in applying for discretionary appeal. *Michigan Comp. Laws Ann.* § 770.3a (West 2000). Therefore, by pleading *nolo contendere,* he had to know that the statute would deny him a right to court-appointed counsel. *Halbert,* 545 U.S. at 623, 125 S.Ct. 2582.

The *Halbert* majority rejected Michigan's argument. The court held that Mr. Halbert could not have waived his *constitutional* right to appeal because, "[a]t the time he entered his plea, Halbert, in common with other defendants convicted on their pleas, had no recognized right to appointed appellate counsel he could elect to forgo." *Id.* (six-person majority, including Justice Kennedy).

In so holding, *Halbert* rejected the argument by Justice Thomas in dissent that assuming Mr. Halbert did have a statutory right to counsel on appeal, he waived it when he decided to plead guilty with knowledge that the consequence likely would be that he would not get counsel on appeal. *Id.* at 637–43, 125 S.Ct. 2582

(Thomas, J., dissenting). Moreover, as even Justice Thomas recognized, "Whether Michigan law provides for such counsel says nothing about whether a defendant possesses (and hence can waive) a federal constitutional right to that effect. That Michigan, as a matter of state law, prohibited Halbert from receiving appointed appellate counsel if he pleaded guilty or no contest, is irrelevant to whether Halbert had (and could waive) an independent federal constitutional right to such counsel." *Id.* at 640, 125 S.Ct. 2582.

The parallel to Mr. Taylor's case is remarkable. When Mr. Taylor entered his plea, there was no recognized Sixth Amendment right to have a jury make the factual findings on which a death sentence was based. Indeed the question was not even unsettled in 1991; in the death penalty context, the holding of *Walton v. Arizona*, 497 U.S. 639, 649, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)—that the Sixth Amendment did *not* require a jury to find the aggravating circumstances necessary to impose death—had established that no such right existed.

Just as in *Yeager* and *Halbert*, Mr. Taylor could not have waived his right to jury fact-finding for (borrowing from the language used in *Halbert*) "at the time he entered his plea, [Taylor], in common with other defendants convicted on their pleas, had no recognized right to [a jury determination of the facts relating to punishment] he could elect to forego." *Halbert*, 545 U.S. at 623, 125 S.Ct. 2582. While as the majority opinion notes, Mr. Halbert also was not informed that he definitely would be denied counsel on appeal, review of *Halbert* leaves no doubt that this was not

the paramount basis of the Supreme Court's decision, which turned on whether one can waive a right one does not have, not lack of knowledge of the consequences, as the *Halbert* dissent makes clear. *Id.* at 612–14, 623, 125 S.Ct. 2582.

Colorado faced a very similar issue in *People v. Montour*, 157 P.3d 489 (Colo. 2007). There, defendant pleaded guilty to first-degree murder. In Colorado, as in Missouri, a capital defendant who pleads guilty is denied the right to a jury trial on punishment. 18–1.3–1201(1)(a) C.R.S.2006. Accordingly, the punishment phase trial was held before the judge, who imposed the death penalty. The Colorado Supreme Court reversed, stating, "While a defendant may waive the right to a jury trial on sentencing facts, this waiver must be knowing, voluntary and intelligent." 157 P.3d at 492. The court found that to the extent that the Colorado statute prohibited a jury trial on punishment solely based on a defendant's decision to plead guilty, it therefore violated the Sixth Amendment because the statute "fails to effect a knowing, voluntary and intelligent waiver, as the waiver is automatic when a defendant pleads guilty." *Id.* In other words, the statute could not constitutionally link the waiver of a jury trial on punishment to the waiver of a jury trial on guilt because that would make such a waiver automatic. While a defendant may waive jury fact-finding during the punishment phase, *Blakely* requires that waiver to be knowingly, intelligently and separately waived. *Id.*

The only relevant case cited by the state to the contrary is *State v. Piper*, 709 N.W.2d 783, 806–809 (S.D.2006).[8] In that

---

8. As the State notes, other state supreme courts did distinguish the principle that under *Ring* it is a Sixth Amendment violation to deny a jury trial of punishment, noting that the defendant in *Ring* went to trial while the

defendants in their cases pleaded guilty. But, the State neglects to note that three of these cases—*Colwell v. State*, 118 Nev. 807, 59 P.3d 463 (2002); *Leone v. Indiana*, 797 N.E.2d 743 (Ind.2003); *Illinois v. Alton*, 338 Ill.App.3d

case, the South Dakota Supreme Court interpreted its death penalty procedure statute as providing for a sentencing hearing at which a jury determines the presence or absence of alleged aggravating factors when a defendant pleads guilty. *Piper,* 709 N.W.2d at 804. *Piper* noted that before finding the aggravating factors necessary to impose death, "the [trial] court properly presented Piper with the option of exercising his right to sentencing by a jury as provided by South Dakota's capital punishment statutory scheme." *Id.* at 806. The majority in *Piper* held that although the *Ring* right to a jury finding of aggravating factors had not yet been established at the time of the defendant's sentencing hearing, the defendant had "*specifically* asked to be sentenced by the circuit court, thereby waiving his constitutional right to have a jury determine whether the alleged aggravating circumstances in his case existed beyond a reasonable doubt." *Id. Piper,* then, is distinguishable from this case because Mr. Taylor never specifically requested that a judge be the fact-finder at his punishment trial; indeed, when his sentencing phase was held after remand in 1994, Mr. Taylor specifically asked for a jury, not a judge. Moreover, at no point did the trial court present Mr. Taylor with the option to have a jury. Instead, by operation of section 565.006.2, the fact-finders at both of Mr. Taylor's penalty phase trials were judges.

Much more persuasive and relevant is the dissenting opinion in *Piper,* which adopted the approach taken by this Court in *Taylor,* stating, "the waiver of a substantive right presupposes the existence of

the right in the first place. The language of the statute expressly limits the fact-finding role to the judge in non-jury cases ... the judges ... had no authority to offer jury sentencing." 709 N.W.2d at 821. The dissenting judge concluded that in light of the Supreme Court's holding that there is a constitutional right to jury fact-finding, because the required factual findings were not admitted by the defendant or found by a jury, the death sentence imposed by the judge was in violation of defendant's Sixth Amendment rights. *Id.* at 822.

The principles set out in *Yeager, Halbert* and *Montour* are directly applicable here. Mr. Taylor could not waive a right to punishment-phase jury fact-finding that he did not have. The waiver argument made by the State and accepted by the majority is without merit.

*D. Law of the Case Is an Alternative Bar to the State's Waiver Argument*

Even were *Halbert* not a bar to holding that Mr. Taylor could waive an as yet unrecognized constitutional right to a jury determination of the facts necessary to punishment, the law of the case doctrine bars the state from making such an argument as to Mr. Taylor. This Court already has held that Mr. Taylor did not waive any such right, for he had no right to waive, based on either a statute or the constitution. *Taylor,* 929 S.W.2d at 217, 218–219. This Court also has held that where, as here, it is shown that the defendant did have a right to a jury trial prior to reversal and remand for re-sentencing, then "section 565.035.5(3) does allow 'a

---

355, 272 Ill.Dec. 751, 788 N.E.2d 55, 61 (2003)—were decided prior to, and are at odds with, *Blakely,* in which the United States Supreme Court explicitly held that, to the contrary, *there is a constitutional right to jury fact-finding and that Ring applies even when a*

*defendant pleads guilty.* The fourth case cited by the State, *South Carolina v. Downs,* 361 S.C. 141, 604 S.E.2d 377, 380 (2004), simply relied on the other cases cited and, even though handed down a few months after *Blakely,* does not cite to or distinguish it.

new jury' to be selected for purposes of imposing sentence." *Id.* at 219.

The majority implicitly argues that law of the case does not apply here because the holding in Mr. Taylor's first appeal was made in the context of rejecting Mr. Taylor's argument that his rights were violated when he was not told that he could have jury sentencing if the state agreed to it. But, that is the point, of course. To reject Mr. Taylor's argument, this Court held that Mr. Taylor never had a right to jury sentencing under Missouri statutes in the first place and, therefore, he had no right he could waive. Now that Mr. Taylor embraces this holding, the majority would have this Court takes the opposite view, stating that he could and did waive his right to jury trial. But, the legal point is the same—there was no right, so there was no waiver. The courts cannot alternate between recognizing and not recognizing such a right depending on the issue before it and the consequences of such recognition. There cannot be "no right to waive" when addressing whether counsel failed to inform him of his rights but then "a right to waive" when the question changes to did he chose to waive unrecognized rights. The majority certainly cites no authority to support its conclusion that there is no inconsistency in its holding simply because it was made in response to a different factual question, when the basis of decision—whether factually there was a waiver—is the same.

Under Missouri authority, the holding that Mr. Taylor did not waive a jury determination of punishment is law of the case. The law of the case doctrine is a neutral principle that can inure to the benefit of either the defendant or the State. *Compare State v. Graham,* 13 S.W.3d 290, 293 (Mo. banc 2000); *Ex Parte Calvin,* 689 S.W.2d 460, 462–63 (Tex.Crim.App.1985) (both applying law of the case principles to

defendant's benefit); with *Smulls v. State,* 71 S.W.3d 138, 144 (Mo. banc 2002); *State v. Deck,* 303 S.W.3d 527, 545 (Mo. banc 2010) (both applying law of the case principles to state's benefit).

Of course, there are exceptions to the law of the case doctrine. Appellate courts will not apply the law of the case doctrine if "the first decision was based on a mistaken fact or resulted in manifest injustice or where a change in the law intervened between the appeals." *Deck,* 303 S.W.3d at 545, citing *Walton v. City of Berkeley,* 223 S.W.3d 126, 130 (Mo. banc 2007); accord, *Cross v. State,* 37 S.W.3d 256, 259 (Mo.App.2000) (refusing to apply law of case to preclude defendant from raising issue where law changed between first and second appeals). Similarly, a court will not apply the law of the case doctrine if it is "determine[d] that a new rule with retroactive effect contradicts the law of the case." *Bejarano v. State,* 122 Nev. 1066, 146 P.3d 265, 271 (2006); accord, *Tippins v. State,* 780 So.2d 147, 148 (Fl.App.2001) (court would not apply law of the case because law had changed and sentence was in excess of that allowed by law, making exception for manifest injustice applicable).

In Mr. Taylor's case, however, as noted, these exceptions work in his favor. The only change in the law has been to his benefit—the United States Supreme Court has recognized he had a Sixth Amendment right to jury fact-finding on the issue of punishment, not just on guilt, and *Whitfield* has recognized that this right applies retroactively in Missouri. For these reasons, the State is precluded from claiming that Taylor waived the right to jury sentencing at his guilty plea hearing. Under the doctrine of the law of the case, the issue has already been decided; there was no waiver.

### E. Mr. Taylor Did not Affirmatively Waive Jury Determination of Sentencing as a Factual Matter.

For all of the above reasons, Mr. Taylor could not legally be held to have waived a constitutional right to jury trial that was not yet recognized, and even could he do so, this Court's prior holding that there was no such waiver is law of the case.

Even were it correct to review Mr. Taylor's prior statements to see whether he affirmatively stated he knowingly waived a right to jury trial of the facts necessary to punishment, he did not do so. The guilty plea hearing transcript shows without question that he wanted to plead guilty and that he knew that by doing so he would not have a right to a jury trial on punishment. It uses the word "waiver" only once, and only in the context of acknowledging that because he wanted to plead guilty, he knew he therefore would not be getting a jury trial. Of course, at that time, as discussed, he had no constitutional right to a jury trial on punishment once he pleaded guilty, so this was just a statement of fact. He never said that he independently desired that a jury not be permitted to determine the facts necessary to punishment.

The state and the majority try to fill this gap by citing to testimony made by Mr. Taylor in his first post-conviction hearing, discussed in detail above. Of course, the relevant question is not what Mr. Taylor retroactively might have said he previously thought or would have thought had he been offered a right to a jury trial on punishment, but whether he in fact was offered one and waived it at the time of his guilty plea. He was not and did not.

Even more basically, assuming Mr. Taylor's statements in his post-conviction proceeding about his statutory right to jury trial were the relevant issue, the transcript does not contain the admissions claimed by the State as to waiver. In context, Mr. Taylor clearly states that he wanted to plead guilty because he already had confessed and believed that a trial on guilt made little sense in light of his confession. When the prosecutor asked, "So let me ask you, why is it that you avoided a jury in your decision that you made when you decided to plead in front of Judge Randall? What was it that you were afraid of in front of a jury," the exchange proceeded as follows:

A. It wasn't that I was afraid, it just didn't—I preferred not to go to a jury trial.

Q. Did you have any doubt in your mind that a jury would sentence you to death?

A. Did I have any doubt? I didn't know.

Q. You didn't have an opinion, is what you're telling us under oath, as to what a jury would do?

A. I can't answer that because I'm not the jury. I mean, I would hope that they would understand me accepting—my willingness to admit that I committed this crime and have mercy.

. . . .

Q. Okay. And your testimony before this Judge is that you don't recall any discussions with your attorneys about the likelihood of receiving death in front of a jury?

A. No.

Q. You don't recall and you're telling us under oath in front of this Judge that you don't recall any real discussions about the death penalty likelihood at all?

A. We discussed the issues concerning the First Degree Murder charge of life without parole and possibility of the death penalty. But as far as

discussing what I probably would get going to a jury, we really didn't discuss that.

Q. Why did you decide to plead in front of a Judge? Why did you want to plead in front of Judge Meyers?

A. Because of my videotaped statement.

Q. Did you think that the Judge would be more or less likely to give a death penalty than a jury?

A. I really don't know.

Q. ... You had no discussions, no opinion as to the relative benefits between a Judge or jury for punishment, is that what you're telling us?

A. Yes.

Mr. Taylor does not say he pleaded guilty to waive a jury determination of punishment, as the state contends was the case. Rather, he said that he did not initially want to go to trial before a jury because he had confessed so there was no point to a trial of his guilt and that his counsel did not discuss with him whether a judge or jury would provide him with a better chance for avoiding the death penalty—such a discussion would have been pointless, of course, as he had no opportunity to have a jury trial of punishment once he decided to plead guilty. He did not know which trier of fact would have given him a better chance at avoiding death sentence; that question did not come up and was not an issue his counsel discussed with him because a jury trial of punishment was not an option once he decided to plead guilty.

Counsel confirmed that they did not discuss with Mr. Taylor whether it would be better to have a judge or jury decide the sentence he should receive once he pleaded guilty. Certainly they believed and advised him that he should plead guilty, but

it was because, as Mr. McClain testified, he "believed that the videotaped confession would be very damaging at a guilt phase proceeding" and, thus, a trial of the guilt issues before a jury might look like Mr. Taylor was trying to back out of his admissions, which likely would inflame the factfinder. Mr. McClain testified that he "was concerned with how bad the confession would look to a jury of twelve and how bad it would look that [they] were contesting his guilt when he had made that confession." Mr. McClain was not aware whether a defendant could go to trial before a jury but then confess guilt, he had never heard of such a possibility and did not consider it or discuss it with Mr. Taylor. Mr. McClain testified that his "memory was the choice was between the jury and pleading guilty and having the Judge sentence."

Had she thought there was a choice of whether to try punishment to a judge or jury, Ms. Delk testified that she was not sure what she would have recommended, for she saw benefits and detriments to each approach. A judge might better understand Mr. Taylor's criminal history, but according to Ms. Delk factors that may have made a jury favorable were "the remorse that [Mr. Taylor] felt" as well as "the family situation, the family support, that type of mitigation I think would also go well to a jury." Because Missouri law did not permit a jury trial of punishment where defendant pleaded guilty, however, once Mr. Taylor took counsel's advice to plead guilty, Ms. Delk testified that she did not discuss with him these factors tending toward jury sentencing after a plea. Ms. Delk admitted that in this regard she failed in her duty to inform him of all his options.

Far from providing evidence of waiver, the testimony from the original PCR hearing confirms that Mr. Taylor did not waive

the right to have a jury determination of the facts necessary for imposition of the death penalty.

## III. CONCLUSION

For the reasons set out above, Mr. Taylor's death sentence is in excess of that authorized by law in that it was imposed in violation of the Sixth Amendment as it was based upon facts found by a judge, not a jury. I agree with the majority that this right can be knowingly and intelligently waived, but because there was no valid waiver in this case, I believe that Mr. Taylor is entitled to habeas relief and that the death sentence imposed should be vacated.